**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

KEVIN HOIT,

                                        Plaintiff,

          v.                                               1:15-CV-134
                                                           (CFH)

CAPITAL DISTRICT TRANSPORTATION
AUTHORITY, et al.,

                                        Defendants.

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

APPEARANCES:                              OF COUNSEL:

Law Offices of Elmer Robert Keach, III, P.C.    ELMER R. KEACH, III., ESQ.
One Pine West Plaza, Ste. 109             MARIA K. DYSON, ESQ.
Albany, New York 12205
Attorneys for plaintiff

O'Connor, O'Connor Law Firm               DENNIS A. FIRST, ESQ.
20 Corporate Woods Blvd.                  DANIELLE M. MEYERS, ESQ.
Albany, New York 12211
Attorneys for defendant CDTA

Gleason, Dunn Law Firm                    LISA F. JOSLIN, ESQ.
40 Beaver Street                          RICHARD C. REILLY, ESQ.
Albany, New York 12207
Attorneys for defendants
Clanton, Mancini

**CHRISTIAN F. HUMMEL**
**United States Magistrate Judge**

### MEMORANDUM-DECISION & ORDER

          Presently pending before the Court[1] is (1) defendants Tony Clanton and Frank

Mancini's Motion for Summary Judgment (Dkt. No. 79), (2) defendant Capital District

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

          [1] Parties consented to the undersigned's jurisdiction of this Action in accordance with 28 U.S.C. §
636(c) and Federal Rule of Civil Procedure 73 . Dkt. Nos. 77, 78.

Transportation Authority's ("CDTA") Motion for Summary Judgment (Dkt. No. 81), and (3) plaintiff's Cross Motion for Leave to file a Second Amended Complaint (Dkt. Nos. 88, 89). Plaintiff opposed defendants' motions. Dkt. Nos. 89, 90, 91. Defendant CDTA filed a reply to its Motion for Summary Judgment and in opposition to plaintiff's motion to file a Second Amended Complaint. Dkt. No. 95. Defendant Clanton and Mancini filed a reply "in further support of motion for summary judgment and in opposition to plaintiff's motion for leave to amend." Dkt. No. 97.

Following this Court's July 19, 2016 Decision and Order, the only remaining claims in this action are as follows: (1) plaintiff's first cause of action against defendants Baez and Mancini ("Violation of Constitutional Rights Under Color of State Law – Violation of Equal Protection Clause/Sexual Harassment"), (2) plaintiff's third cause of action against defendants CDTA and Mancini ("Violation of Constitutional Rights Under Color of State Law – Implementation of Municipal Policies and Practices that Directly Violate Constitutional Rights/Failure to Implement Municipal Policies to Avoid Constitutional Deprivations and/or Failure to Train and Supervise Employees under Color of State Law"), and (3) plaintiff's fourth cause of action against defendants CDTA, Baez, and Clanton ("Violation of New York State Human Rights Law - New York Executive Law § 296"). Dkt. Nos. 22, 51.

The undersigned will first address the dispositive motions (Dkt. Nos. 79, 81) and will then address plaintiff's motion to file a second amended complaint (Dkt. No. 88). For the reasons that follow, CDTA's Motion for Summary Judgment is granted, defendants Mancini and Clanton's Motion for Summary Judgment is granted, and

plaintiff's Motion to File a Second Amended Complaint is denied.

## I.  CDTA's Motion for Summary Judgment

Defendant CDTA argues that plaintiff fails to demonstrate that CDTA should be held liable for the conduct of its employees under Monell v. New York City Dep't of Soc. Services, 436 U.S. 658 (1978), pursuant to 42 U.S.C. § 1983, because plaintiff presented no evidence that he suffered constitutional harm as a result of a policy, practice or custom, or deficient training.  See Dkt. No. 81-19.  Further, CDTA contends that plaintiff has failed to state a claim for hostile work environment in violation of the New York State Human Rights Law ("NYSHRL")[2] § 296 because the alleged sexual harassment was not sufficiently severe or pervasive as to alter the conditions of plaintiff's employment.  Id.  In response, plaintiff argues that CDTA is liable for the actions of the individual defendants because it "condoned and created a workplace environment that was permeated with sexually inappropriate conduct" and because senior officials engaged in, or were aware of and failed to remedy, sexually-inappropriate conduct.  Dkt. No. 91 at 27.

---

[2]  An analysis of hostile work environment is the same whether it is analyzed under section 1983, Title VII, or NYSHRL.  See Hayut v. State Univ. of New York, 352 F.3d 733, 744-45 (2d Cir. 2003) (noting that a § 1983 sexual harassment claim alleging violations of one's Fourteenth Amendment equal protection rights that is based on a hostile environment theory, is "governed by traditional Title VII 'hostile environment' jurisprudence"); Smith v. Town of Hempstead Dep't of Sanitation Sanitary Dist. No. 2, 798 F. Supp. 2d 443, 451 (E.D.N.Y. 2011) ("The standard for showing a hostile work environment under Title VII, . . . Section 1983, and the New York State Human Rights Law is essentially the same."), accord. Piccone v. Town of Webster, 09-CV-6266(MAT), 2011 WL 3322550, at *12 (W.D.N.Y. Aug. 2, 2011); Kennedy v. New York, 14-CV-0990S, 2016 WL 850910, at *6 (W.D.N.Y. Mar. 4, 2016); Bermudez v. City of New York, 783 F. Supp. 2d 560, 587 (S.D.N.Y. 2011).

## A. Summary Judgment Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. See FED. R. CIV. P. 56. The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. See FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A 'genuine' dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the nonmoving party." Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988) (citation omitted). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. See Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997). However, "inferences must be supported by affirmative facts and must be based on relevant, admissible evidence." Gen. Accident Ins. Co. of Am. v. Merritt-Meridian Constr. Corp., 975 F.Supp. 511, 515 (S.D.N.Y.1997) (citing FED. R. CIV. P. 56(e)). When a motion for summary judgment is made and supported . . . an adverse party may not rest upon the mere allegations or denials of the . . . pleading, but the adverse party's response, by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56(e)], must set forth specific facts showing that there is a genuine issue for trial." St. Pierre v. Dyer, 208 F.3d 394, 404 (2d Cir. 2000). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an

4

otherwise properly supported motion for summary judgment[.]" Rexford Holdings, Inc. v. Biderman, 21 F.3d 522, 525 (2d Cir. 1994) (citation omitted ).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. See Gallo v. Prudential Residential Services, Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

## B. Statements of Facts

In support of its Motion for Summary Judgment, CDTA filed a Statement of Material Facts. Dkt. No. 81-20. The facts relating to CDTA's Motion for Summary Judgment are related herein in the light most favorable to plaintiff as the nonmoving party. See Skubel, 113 F.3d at 334.

### 1. Undisputed Facts

Plaintiff contends that on November 7, 2013, plaintiff, then a mechanic for CDTA, worked the second shift in CDTA's Albany garage. Dkt. No. 90 at 5. November 7, 2013 was plaintiff's last day of employment with CDTA; he voluntarily resigned on October 25, 2013, effective November 7, 2013, in order to work for a different company

in a job that provided a pay increase.  Id. at 6.  Plaintiff did not resign due to the incident

nor to any incident of sexual harassment at CDTA.  Id. at 6.  Defendants Juan Baez

and Frank Mancini were maintenance foremen, with Baez as a foreman for the

mechanics and Mancini as foreman for the service technicians.  Dkt. No. 81-20 at 1.

Foremen "assigned work and oversaw personnel on the shop floor" and "could report

misconduct on the part of mechanics, but could not and did not recommend discipline

or take disciplinary action."  Id. at 2.  Foremen were not involved in hiring or

interviewing.  Id.

Mancini was not supervising plaintiff on November 7, 2013.  Dkt. No. 81-20 at 2;

Dkt. No. 20 at 3.  Plaintiff considered Baez to be a "friend at work."  Id. at 4.  Plaintiff

and Clanton were friendly at work.  See id. at 5.  Plaintiff would "joke around" with

Mancini at work.  Id.  Plaintiff was working on a bus in a bus bay during the incident in

question.  Id. at 6, 35.  After the incident, plaintiff smoked a cigarette with Clanton and

another coworker.  Dkt. No. 90 at 13.  Plaintiff took his meal break that evening with

Baez and Mancini.  Id. at 15.  Plaintiff worked the remainder of his shift.  Id.

CDTA had in place an Employee Conduct Policy, Employee Rules of Conduct

Policy, and a Preventing Harassment in the Workplace policy.  Dkt. No. 81-20 at 2.

Pursuant to CDTA's policies, "upon receiving a complaint of alleged harassment, the

Director of Human Resources (or their designee) undertakes an investigation to

determine if the Policy on Preventing Harassment in the Workplace has been violated,

and employees violating the policy are subject to discipline which can include

suspension and termination[.]"  Id.  Plaintiff received an employee handbook when he

6

began working for CDTA, and underwent yearly training about discrimination and harassment in the workplace.  Id. at 2-3.  Plaintiff never reported the November 7, 2013 incident to anyone at CDTA or to the police.  Dkt. No. 90 at 16-17.  Plaintiff never had a problem with Baez before the incident, nor had Baez previously done anything to plaintiff that plaintiff felt to be inappropriate.  Id. at 26.  Plaintiff never personally experienced any act that be perceived to be harassment at CDTA prior to the incident.  Id.  Similarly, plaintiff never before experienced any incidents with Mancini.  Id. at 32.  Plaintiff was friendly with Clanton both in and outside of work.  Id.

## 2.  Plaintiff's Facts

In addition to taking plaintiff to the ground and then sitting on top of plaintiff, Clanton also "dry humped the Plaintiff by rubbing his hips and groin on the Plaintiff's back, while making humping noises and telling the Plaintiff to 'Let it happen.  Let it happen.'"  Dkt. No. 90 at 7.  Plaintiff was not laughing during the incident, but yelling at defendants and was "physically struggling to get away from them."  Id.  Richard Chevalier, a CDTA technician, observed that plaintiff was upset for the remainder of the evening.  Id. at 8.  Clanton saw Baez approach and saw him kneel over plaintiff.  Id.  Clanton did not immediately jump off of plaintiff after noticing Baez's conduct.  Id.  Mancini recorded the incident oh his cellular phone and showed the video to other employees.  Id. at 12.

Plaintiff suffered anxiety and depression as a result of the incident, and his symptoms began approximately a week after the incident.  Dkt. No. 90 at 24.  He also

suffered humiliation and embarrassment during the incident, and after, when coworkers circulated pictures. Id. Plaintiff has sought and obtained psychological counseling and "was diagnosed with extreme depression and PTSD." Id. at 63. Plaintiff "suffered from anxiety, depression, shock, embarrassment and anger." Id. Plaintiff began employment with CSX in November 2013 after completing a training program. Id. at 25.

Baez and Clanton "were known to have repeatedly engaged in sexually inappropriate conduct in the work place." Dkt. No. 90 at 56. Baez had been counseled in the past after an employee complained that Baez showed him pornographic videos in the workplace. Id. at 58. Clanton and other employees had a "ritual" that involved hazing employees on their last day of work for CDTA. Id. On November 7, 2013, Baez was responsible for supervising the floor, including plaintiff, the cleaners, and the mechanics, and was in a supervisory role over plaintiff. Dkt. No. 90 at 34. Mancini "was responsible for the cleaners on November 7, 2013, and had a supervisory role over the plaintiff." Id. at 34. Clanton had no direct supervisory role over plaintiff on the evening of the incident. Id. at 34-35.

### 3. CDTA's Facts

Immediately before the incident, plaintiff was working on a bus in a bay in the Albany garage. Dkt. No. 81-20 at 3. Mr. Clanton "grabbed plaintiff around his arms from behind, picked him up, and they both went down to the ground wrestling – with plaintiff ending up facing the floor and Clanton sitting on top of plaintiff's lower back." Id. at 4. Clanton heard plaintiff laughing. Id. at 4. Baez approached plaintiff and

8

Clanton and pulled his pants down.  Id. at 3.  Baez then kneeled over plaintiff's head while wearing boxer-brief underwear.  Id.  Clanton did not see Baez approach, lower his pants, or kneel over plaintiff.  Id.  Once Clanton realized what Baez was doing, Clanton "jumped up and off of the plaintiff."  Id.  Clanton did not know that Baez was going to lower his pants and kneel over plaintiff.  Id. at 4.

Mancini observed part of the incident.  Dkt. No. 81-20 at 4.  Mancini was a foreman for the service technicians, but was not supervising plaintiff on November 7, 2013.  Id. at 2.  Mancini held up his cell phone as he approached plaintiff, Clanton, and Baez because he intended to take a photograph; however, he did not take a photograph.  Id. at 4.  Mancini was not aware that Baez's pants were lowered until Baez stood up.  Id. at 5.  Mancini heard plaintiff laughing.  Id. at 8.  Clanton did not see Baez lower his pants and kneel over plaintiff.  Id. at 4.  As soon as Clanton noticed Baez, he jumped off of plaintiff.  Id.  After the incident, plaintiff smoked cigarettes with Clanton and talked about inheriting his grandmother's house.  Id. at 5.  Plaintiff did not tell Clanton he was upset.  Id.  After the incident, plaintiff took his meal break with Baez and Mancini.  Id.  At the end of his shift, plaintiff said goodbye to Mancini, gave him a hug, and gifted him a flashlight.  Id. at 5.  Mancini observed that plaintiff appeared "fine" and "normal."  Id.

Ravin Takechand, a CDTA mechanic, took a picture of the incident, and sent the picture to another CDTA employee, Richard Chevalier.  Dkt. No. 81-20 at 6.  The following day, Chevalier sent the picture to plaintiff.  Id.  An administrative assistant for CDTA's Superintendent of Maintenance Randy Premo reported the incident to him.  Id.

In addition, CDTA employee Ravin Takechand reported the incident to Steve Wacksman, Assistant Superintendent of Maintenance.  Id. at 7.  Mr. Wacksman reported the incident to Kelli Shreivogl, Director of the Human Resources Department. Id.  Shreivogl reported the incident to Premo, who began an investigation.  Id.  Clanton, Mancini, and Baez were suspended during the investigation.  Id.  Baez reported that no one else knew that he was going to act as he did.  Id.  Baez further indicated that plaintiff was laughing during the incident.  Id.  Following the investigation, Baez was terminated from his employment with CDTA.  Id. at 9.  Clanton and Mancini were suspended for ten days, were made subject to "last chance" agreements, and underwent harassment prevention training.  Id.

Sometime after the incident, plaintiff's stepfather, Dennis Dugan, a former CDTA employee, contacted Shreivogl to discuss the incident.  Dkt. No. 81-20 at 9.  He indicated that plaintiff was doing "fine."  Id.  Plaintiff testified that he had never had a similar experience to the incident in question during his employment with CDTA nor had he witnessed a similar incident.  Id. at 10.  Plaintiff never before had any issues with Baez or Clanton and had never observed them engaged in similar acts.  Id.  Shreivogal and Premo never had heard of Baez or any other employee engaging in similar conduct at the Albany garage.  Id.  Wacksman was unaware of Baez, Clanton, or Mancini engaging in inappropriate workplace conduct on any other occasion.  Id. at 11.

## C. Analysis

### 1. Section 1983

CDTA argues that plaintiff's section 1983 claim must fail because plaintiff has not alleged facts plausibly suggesting a violation of his constitutional rights pursuant to any municipal policy or custom.  Dkt. No. 81-19 at 13; see Monell v. Dep't of Soc. Services of City of N.Y., 436 U.S. 658 (1978).  Dkt. No. 89-19 at 13.  In opposition, plaintiff contends that there existed a municipal custom at CDTA, through its supervisors, of "condoning" and "creating" a workplace environment that was permeated with sexually-inappropriate conduct.  Dkt. No. 91 at 28, 31.

"It is well settled that a municipality cannot be held liable under § 1983 solely on a theory of respondeat superior."  Marcano v. City of Schenectady, 38 F. Supp. 3d 238, 265 (N.D.N.Y. 2014) (citing Monell, 436 U.S. at 692).  "[T]o hold a municipality liable under section 1983 for the unconstitutional acts of its employees, a plaintiff is required to prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  Knox v. County of Ulster, 11-CV-0112 (GTS/CFH), 2013 WL 286282, at *6 (N.D.N.Y. Jan. 24, 2013) (citation, internal quotation marks, and alterations omitted).  As the Southern District of New York has clearly laid out,

> a plaintiff may satisfy the "policy or custom" requirement by alleging one of the following.  He or she may allege the existence of "(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come

into contact with the municipal employees." <u>Brandon v. City of New York</u>, 705 F. Supp.2d 261, 276-77 (S.D.N.Y. 2010) (citations omitted).

<u>Id.</u> at 637.

A municipal custom "need not receive formal approval by the appropriate decisionmaker[.]" <u>Newton v. City of New York</u>, 566 F. Supp. 2d 256, 271 (S.D.N.Y. 2008). Generally, although a plaintiff "is not required to identify an express rule or regulation to establish a <u>Monell</u> claim, proof of 'a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy.'" <u>Marcano</u>, 28 F. Supp. 3d at 266 (citation omitted); <u>see</u> <u>also</u> <u>Cowan</u>, 95 F. Supp. 3d at 637 (citation omitted)). To demonstrate the second element, causation, "a plaintiff must show 'a direct causal link' or 'an affirmative link' between the municipal policy or custom and the alleged constitutional deprivation (i.e., that the policy or custom was the 'moving force' behind the deprivation.)." <u>Knox</u>, 2013 WL 286282, at *6 (citing <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 387, 386 (1989)).

Plaintiff argues that "[t]he upper-level supervisor's direct participation in and failure to remedy this atmosphere represents both deliberate indifference[3] to the Plaintiff's constitutional rights, and condonation sufficient to establish a hostile work

---

[3] In this one line in his opposition brief, plaintiff mentions "deliberate indifference." Dkt. No. 91 at 32-33. However, plaintiff provides no deliberate indifference analysis in his opposition brief; indeed, he does not even set forth the deliberate indifference standard. <u>See generally</u> Dkt. No. 91. Further, his brief indicates that he "intends to prove the third factor, that CDTA, through its supervisors, tolerated, condoned, and created a custom of widespread sexually inappropriate behavior in its Albany Garage." <u>Id.</u> at 28. Thus, the undersigned understands the lack of a deliberate indifference analysis in plaintiff's opposition brief and indication in his opposition papers that he seeks to proceed under the "third factor" as evidence that plaintiff does not intend to proceed with a deliberate indifference analysis.

environment claim under the NYSHRL and § 1983." Id. at 32-33.[4]  See Dkt. No. 22 at

910, 14; Dkt. No. 91 at 27-33.  Plaintiff contends that the workplace was laden with

sexual misconduct such that it created an inference that the CDTA was aware of, and

condoned, the misconduct.  Id. at 31-32.  Plaintiff argues that some of the misconduct

led to the filing of formal complaints "of which CDTA was aware."  Id.  Thus, plaintiff

alleges the existence of "a practice so consistent and widespread that, although not

expressly authorized, constitutes a custom or usage of which a supervising

policy-maker must have been aware."  Brandon, 705 F. Supp.2d at 276-77; see also

Patterson v. County of Oneida, N.Y., 375 F.3d 206, 226 (2d Cir. 2004)  ("One way of

demonstrating Monell liability is to show "that a discriminatory practice of municipal

officials was so 'persistent or widespread' as to constitute 'a custom or usage with the

force of law' or that a discriminatory practice of subordinate employees was 'so manifest

as to imply the constructive acquiescence of senior policy-making officials.'") (additional

citation omitted); Herrera v. Safir, 17 F. App'x. 41, 43 (2d Cir. 2001) (summary order).

　　　　Plaintiff contends in his opposition brief that the misconduct that made up the

---

[4]  Although raised in his Amended Complaint, plaintiff does not appear to argue in opposition to
CDTA's Motion for Summary Judgment that there existed a formal policy endorsed by a municipality or
that there was action taken by government officials responsible for establishing the municipal policies that
caused the particular deprivation in question.  See Dkt. No. 22, 91.  Further, although plaintiff mentioned in
his Amended Complaint that CDTA failed to properly train employees and states that "negligent
supervision and/or retention of employees" constitute "prima facie tort" "under New York law," plaintiff
does not contend that defendants negligently hired/failed to supervise in violation of section 1983 or argue
in opposition to CDTA's Motion for Summary Judgment that CDTA failed to train its employees in violation
of section 1983.  See Dkt. No. 91.  When a plaintiff raises claims in a complaint but does not raise them in
opposition to a motion for summary judgment, such claims can be deemed by the Court to have been
abandoned.  See, e.g., Duarte v. St. Barnabas Hosp., 265 F. Supp 3d 325, 352 (S.D.N.Y. 2017) (quoting
Taylor v. City of New York, 269 . Supp. 2d 68, 75 (E.D.N.Y. 2003) (noting that where a plaintiff raises a
claim in his complaint, but does not address the claim in response to a motion for summary judgment, that
claim is deemed abandoned)).

"widespread" sexual misconduct at the Albany garage included "butt slapping, dry humping, exposing genitals, placing genitals on other employees, shoving a thumb up an employee's buttocks, watching pornography in the workplace, showing sexually inappropriate videos and displaying photographs of naked women in the garage." Dkt. No. 91 at 32.  Plaintiff contends that in addition to employees and low-level supervisors engaging in this conduct, "upper level supervisory employees" and superintendents also "repeatedly" engaged in this conduct.  Id.  He argues that the supervisors' engaging in this conduct "demonstrate[s] that there was an unwritten policy of pervasive sexual misconduct in the workplace that was tolerated by CDTA."  Id. at 32.

CDTA argues that the only instance of alleged sexual misconduct that plaintiff observed was Steve Wacksman, Assistant Superintendent in the Albany garage, slapping other men's buttocks a few times.  Dkt. No. 81-19 at 16.  CDTA contends that the remainder of the conduct plaintiff cites in support of his argument that sexual misconduct was pervasive in the Albany garage was "learned through hearsay from other employees."  Id.

A close review of plaintiff's allegations supporting his argument that the CDTA garage was permeated with sexual misconduct demonstrates that several of these alleged incidents are founded on hearsay and "rumors" and are unsupported by testimony of someone who directly witnessed the alleged events.  Further, plaintiff's references to acts of misbehavior, which plaintiff did not observe, also does not suffice to support an argument that sexual misconduct permeated the workplace.  There is no evidence in the record that any of this alleged conduct was reported to CDTA.  In his

Amended Complaint, plaintiff claims that (1) in August 2013, Baez and Clanton "assaulted another CDTA employee, whereby the tackled him and pretended to rape him, by 'dry humping him," (Dkt. No. 22 at 5); (2) "Defendant Baez and Clanton had 'Tea Bagged' other CDTA employees" and one such act "was witnessed by a high ranking supervisor at the CDTA"; (3) "[i]n or around 2008 . . . many CDTA employees, including Jimmy Welsh who was a mechanic at the time, had observed Defendant Baez expose his penis on the job - Something that Defendant Baez routinely thought was funny"; (4) "[i]n or about 2012, a woman who was employed as a call taker for the CDTA filed a sexual harassment claim against Defendant Baez"; (5) "[s]everal CDTA employees filed complaints against Defendant Baez, prompting [CDTA] to require him to take a training class on how to talk with other individuals"; and (6) "[i]n or about 2002, a jury awarded $1.5 million dollars to a woman who was sexually abused by a CDTA bus driver." Dkt. No. 22 at 5-6. However, plaintiff has not provided any affidavits or deposition testimony to support these claims.[5]

First, plaintiff's opposition papers fail to provide either argument or support for the claims he sets forth in his amended complaint that (1) Baez and Clanton assaulted and/or "dry humped" another employee in August 2013, (2) Baez and Clanton had "tea bagged" other employees, and a "high ranking" supervisor witnessed this conduct, or (3) that "many employees" witnessed Baez expose his penis in 2008. See Dkt. No. 22 at 5; Dkt. No. 91. Tackechand testified that he has seen Baez expose his genitals and

---

[5] It is also noted that plaintiff fully fails to demonstrate how a 2002 case involving a bus driver – about which plaintiff provides no detail, including whether or not the victim was a CDTA employee and if the incident occurred in the context of employment – is relevant to an assessment of the CDTA workplace between and amongst employees.

walk across the shop, that he observed Baez do this on one occasion, and "heard" that he has done this on another occasion. Dkt. No., 89-44 at 57. Takechand also testified that "management was aware of it," but "never did anything about it." Dkt. No. 89-44 at 57, 59. However, plaintiff has provided no affidavits or testimony from any other employee who allegedly witnessed such conduct. Further, although Baez testified that he "heard" that Clanton has "dry humped" other employees, and "heard" that another employee who he could not identify was dry humped by an unspecified perpetrator, he testified that he has never observed Clanton or others engage in this conduct. Dkt. No. 89-35 at 114-18. The only other testimony regarding employees' exposing their genitals came from Baez who testified that he "heard" rumors that someone placed his genitals on the face of a sleeping employee at some point before Baez came to work for CDTA, and that he "heard" rumors that someone at would expose his genitals and chase people. Dkt. No. 89-35 at 172-73. This testimony based on rumors and unspecified incidents does not serve to support a claim that the work environment was permeated with sexual misconduct or harassment.

Insofar as plaintiff contends that employees displayed naked photographs of women in the garage, Dkt. No. 91 at 32, plaintiff refers to Baez's testimony that employees, but not supervisors, kept sexually-inappropriate photographs of women in their toolboxes (Dkt. No. 89-35 at 164). Baez testified that Premo and Wacksman knew about photos in toolboxes because "you can see it"; however, he further testified that he had never heard Premo or Wacksman talk about the toolbox photos. Dkt. No. 89-35 at 164-65. As for the conduct plaintiff discusses involving complaints in 2009 regarding

Baez accessing or attempting to pornography at work in and Shagalski accessing

pornography from a work computer, the record demonstrates that these incidents were

investigated by CDTA, which does not support an argument that CDTA condoned

misconduct of which they were aware.

Next, plaintiff references testimony of Ravin Takechand who testified that he

(1) saw Baez pull his pants down "once" and "heard" that Baez did this on another

occasion, and that management was aware of it; (2) Thomas, Baez, and Clanton would

smack his and other employees' buttocks; (3) Clanton licked an employee's neck and

stuck his thumb in employees' buttocks; (4) Clanton and Baez would give employees

"wedgies," and Wacksman gave people "wedgies" when Wacksman was a mechanic;

(5) Wacksman once walked into locker room with his underwear "tucked into" his

buttocks; and (6) Wacksman would "joke" by speaking in a "homosexual voice" while

making sexual comments about how employees looked and using terms that were

derogatory toward homosexuals. Dkt. No. 89-44 at 148, 152-153 .  The only incident

that employees Thomas and Chevalier testified to was that Wacksman had slapped

their buttocks.  Dkt. No. Dkt. No. 89-36 at 114-15; 89-45 at 15.  Thomas indicated that

Wacksman had slapped his buttocks on one occasion, while "playing around," and

Chevalier testified that Wacksman slapped his buttocks on one occasion when

Wacksman was a trainer, that Chevalier told him to stop, and that Wacksman did not do

it again.   Dkt. No. 89-36 at 114-15; Dkt. No. 89-45 at 15-18.

To the extent plaintiff refers to inappropriate photos of women being displayed in

employees' toolboxes, plaintiff relies on the testimony of Takechand, who states that

supervisors were "aware" of this conduct because "you can see it," Dkt. No. 89-35 at

164-65, the mere existence of inappropriate conduct or material in a workplace where a

supervisor would be present is not enough to demonstrate knowledge of that conduct or

material by a supervisor. See McBride-Crawford v. General Mills Cereals Operations,

Inc., No. 12-CV-1180S, 2015 WL 4208608, at *5 (W.D.N.Y. July 9, 2015) (rejecting the

plaintiff's argument that "the presence of pornographic magazines and graffiti in the

work shanties can be imputed to [the employer] because Plaintiff's supervisor . . .

inspected the shanties, and therefore he 'must have known'" where (1) the plaintiff

testified that she was unsure whether the supervisor ever saw the pornography/graffiti,

and (2) although a coworker observed the pornographic magazines, there was no

evidence that supervisors were aware of the magazines).

        In referencing the alleged misconduct engaged in by supervisory employees,

plaintiff refers to (1) Shagalski who was disciplined in 2009 after it was determined he

viewed pornographic photographs and videos from a work computer (Dkt. Nos. 89-10

[Exh. 10], 89-11); and (2) Baez's formal counseling after it was determined Baez

attempted to visit pornographic websites in March 2009 on a CDTA computer (Dkt. No.

89-13 [Exh. 13], Dkt. No. 89-48 [Exh. 48]). The evidence plaintiff provides as to these

two cases demonstrates that any misconduct that was reported to CDTA was

investigated and the employees determined to have been involved were disciplined.

See Dkt. No. 91 at 32. Thus, these allegations cannot support an argument to impute

the individual defendants' alleged misconduct to CDTA.

        Insofar as plaintiff contends that he observed Wacksman, then an assistant

superintendent, slap the buttocks of male employees, he fails to explain how such conduct amounts to sexually-inappropriate conduct permeating the workplace or a condoning of sexually-harassing behavior.  Neither plaintiff nor any other employee who testified that Wacksman had slapped their buttocks reported the conduct or otherwise indicated that they found it to be harassing.  Two of the three employees other than plaintiff who testified about Wacksman's conduct indicated that they did not perceive Wacksman's buttocks slapping to be sexual in nature as they felt he did it in a joking manner or like "football players."  Dkt. No. 35 at 118; Dkt. No. 89-45 at 15-16.

The cases plaintiff cites where the courts found the existence of an unlawful policy or custom differ from the case at bar as in each of those cases there was evidence of a consistent practice of alleged misconduct and the reporting of such practice to the employer.  See Dkt. No. 91.  In Depew v City of St. Marys, 787 F.2d 1496, 1499 (11th Cir. 1986), the plaintiff alleged that there was a lack of training, insofar as there were five other incidents of excessive force, and there was no training for the employees on the use of force.  Here, there is no supported allegation of a lack of training.   In McNabola v. Chicago Transit Auth.,10 F.3d 501 (11th Cir 1993), the Eleventh Circuit found evidence of a widespread custom or policy of terminating white employees in favor of African-American employees where there was evidence of several white employees who complained about not being assigned new work or being terminated, and evidence that over seventy percent of new hires were African-American.  In Hawkins v. Cty of Oneida, N.Y., 497 F. Supp. 2d 362 (N.D.N.Y. 2007), the Court held there were issues of fact regarding the existence of a widespread policy or

19

custom where the plaintiff submitted affidavits from various employees providing examples of the undersheriff demonstrating discriminatory attitudes toward African-American employees.  Further, in Hawkins, the Court provides very little factual detail in its decision, and the Court's discussion of the offending employee was about a supervisor who was not disputed to have policy-making authority.  In Bohen v. City of E. Chicago, Ind., 799 F.2d 1180, 1189 (7th Cir. 1986), there was evidence that the "victims" complaints of the supervisor's sexual harassment were addressed by the employer "superficially if at all, and the department had no policy against sexual harassment." Here, it is not disputed that CDTA had a policy against sexual harassment, and it is clear that all reported incidents were addressed by CDTA, not ignored as in Bohen. Therefore, none of these cases plaintiff cites demonstrate that the employer would be deemed to have implicitly condoned a work environment similar to the one alleged at the Albany garage – where the vast majority of the alleged incidents of sexual misconduct or harassment were never reported to the employer, did not involve the plaintiff, and did not involve repeated conduct that employees reported to be offensive.

Ultimately, the Court has not been presented with facts suggesting that this is a case where "a local government [employer] is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government [employer] has acquiesced in or tacitly authorized its subordinates' unlawful actions.'" Benacquista v. Spratt, 217 F. Supp. 3d 588, 600 (N.D.N.Y. 2016) (quoting Triano v. Town of Harrison, N.Y., 895 F. Supp. 2d 526, 534 (S.D.N.Y. 2012)).   The examples of sexual harassment or sexually-inappropriate behavior plaintiff points to are insufficient to plausibly allege

that CDTA "tacitly authorized its subordinates' unlawful actions." <u>Triano,</u> 895 F. Supp. 2d at 534.  As indicated, several of the examples plaintiff uses to support his argument that the Albany CDTA garage was permeated with sexual conduct involve hearsay claims of rumors.  <u>See</u>, <u>e.g.</u>, <u>Feingold v. New York</u>, 366 F.3d 138, 155 n.17 (2d Cir. 2004) ("In reviewing the district court's grant of summary judgment, . . . we may only consider admissible testimony.").  "It is well settled that hearsay is insufficient to withstand a motion for summary judgment." <u>Hudson v. Fischer</u>, No. 06-CV-1534, 2008 WL 5110974, at *9 (N.D.N.Y. Dec. 2, 2008) (citing FED. R. CIV. P. 56(e)(1)).  This is not a case where allegations of harassment and/or misconduct were reported but the employer failed to investigate.  <u>Cf.</u> <u>Cowan v. City of Mount Vernon</u>, 95 F. Supp. 3d 624, 642 (S.D.N.Y. 2015).  All reported incidents of sexual misconduct were appropriately addressed.

Accordingly, as plaintiff has not demonstrated that there existed a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware," <u>Brandon</u>, 705 F. Supp.2d at 276-77, CDTA's Motion for Summary Judgment is be granted.

## 2. New York State Human Rights Law

CDTA argues that there exists no basis to impute CDTA its employees' alleged sexual harassment to hold CDTA liable for hostile work environment under the NYSHRL, New York State Executive Law § 296.  Dkt. No. 81-19 at 18.  Specifically, CDTA contends that plaintiff's NYSHRL hostile work environment claim must fail

because (1) Baez, Clanton, and Mancini did not have supervisory authority over plaintiff; and (2) CDTA "provided a reasonable avenue for complaint and did not know about any prior allegedly harassing behavior to which plaintiff was subjected."  Dkt. No. 81-19 (citing Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 441 (2d Cir. 1999)).

Plaintiff contends that CDTA was "negligent" because "sexually inappropriate conduct" permeated the CDTA garage, and that the employees' conduct should be imputed to CDTA because CDTA knew or should have known about the misconduct and failed to take action.  Dkt. No. 91 at 29-30.  More specifically, plaintiff contends that lower- and upper-level supervisors engaged in the conduct which "demonstrate[s] that there was an unwritten policy of pervasive sexual misconduct in the workplace that was tolerated by CDTA."  Id. at 31-32.  Plaintiff suggests that because sexual misconduct was commonplace in the Albany garage, CDTA should be deemed to have condoned such behavior.  Id.  Thus, plaintiff argues that he has sufficiently demonstrated that the individual defendants' sexual misconduct should be imputed to CDTA.  Id.

### A.  Hostile Work Environment

The Second Circuit has held:

> "A hostile work environment claim requires a showing (1) that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and (2) that a specific basis exists for imputing the objectionable conduct to the employer."  Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (quoting Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997)). Under the first prong, the plaintiff must

demonstrate that "the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." Id. (citations omitted). The plaintiff must show both that the misconduct was "severe or pervasive enough to create an objectively hostile or abusive work environment" and that she "subjectively perceive[d] that environment to be abusive." Id. And to "meet the threshold of severity or pervasiveness," incidents must be "sufficiently continuous and concerted" rather than episodic or isolated. Id. (internal quotation marks and citation omitted).[6]

Pellegrini v. Sovereign Hotels, Inc., 740 F. Supp. 2d 344, 351 (N.D.N.Y. 2010); see also Allen v. Advanced Digital Info. Corp., 500 F. Supp. 2d 93, 104 (N.D.N.Y. 2007). "In determining whether a work environment is hostile, the Court examines all of the circumstances, which "'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Olsen v. Suffolk Cty., No. 15-CV-4064(JS)(AYS), 2016 WL 5395846, at *11 (E.D.N.Y. Sept. 27, 2016) (quoting Redd v. N.Y. Div. of Parole, 678 F.3d 166, 175 (2d Cir. 2012) (additional citation omitted)). "'Conduct that is merely offensive, unprofessional, or childish cannot support a hostile work environment claim.'" Id. (quoting Kahn v. Objective Solutions, Intern., 86 F. Supp.2d 377, 381 (S.D.N.Y. 2000) (citation omitted)). A hostile environment claim must be "evaluated on the basis of the cumulative effect of the abusive conduct." Dawson v. County of Westchester,

---

[6] The standard to demonstrate hostile work environment under Title VII and NYSHRL are the same; accordingly, case law addressing hostile work environment under Title VII applies equally to NYSHRL claims. See, e.g., Weinstock v. Columbia Univ., 224 F.3d 33, 42 n.1 (2d Cir. 2000) (noting that identical standards apply to employment discrimination claims brought under both Title VII and NYSHRL § 296) (citing cases).

373 F.3d 265, 273 (2d Cir. 2004).

The Court finds that plaintiff has not demonstrated that there existed a hostile work environment within the CDTA garage as the sexual harassment or misconduct was not sufficiently severe or pervasive to alter the terms or conditions of plaintiff's employment.  Indeed, as discussed in above, plaintiff testified that he never before witnessed or experienced an incident similar to the one at issue here.

The only arguable incident of "sexual harassment" or sexual misconduct that plaintiff directly witnessed was Wacksman smacking other employees' buttocks on a few occasions.  Dkt. No. 89-40 at 106-07.  He never reported this conduct nor indicated that it made him feel uncomfortable.  Id. at 109.  Plaintiff attempts to contend that because the general work environment was "laden" with sexual misconduct, even if he had not ever witnessed or been personally exposed to those other incidents of misconduct, it amounts to a hostile work environment under NYSHRL.  The Court rejects this theory.

In Galvez v. Means, No. 95 CIV. 9479 (MBM), 1996 WL 487962, at *3 (S.D.N.Y. Aug. 27, 1996), the Southern District of New York rejected a similar argument.  There, the plaintiff contended that a defendant "'perpetrated sexually and racially harassing conduct on other employees,' even if plaintiff was exposed to the conduct on only one occasion . . . . Plaintiff claims that harassment, to be pervasive, need not be perpetrated on the same individual. "  Id.  Although Galavez reviewed a Title VII hostile work environment claim, rather than a NYSHRL claim, the Court finds that this logic applies

equally to plaintiff's NYSHRL hostile work environment claim against CDTA.[7]  The

Galvez Court noted,

> In essence, plaintiff claims that she has a claim under Title
> VII because [the individual defendant] created a pervasively
> hostile work environment, which the City was aware of, and
> which the plaintiff unwittingly stumbled into. But, as noted
> above, hostile work environment sexual harassment must
> affect the terms and conditions of the plaintiff's employment.
> Title VII does not concern the terms of defendant's
> employment. Even if [the individual defendant] hollered
> sexual slurs at every female police officer who entered his
> work area, any such employee must suffer some harm to her
> employment to have a claim under Title VII.

Id.  Much like the Southern District found in Galavez, the Court determines that to

demonstrate the existence of a hostile work environment, the plaintiff must demonstrate

that the conditions of his employment personally were altered by the "pervasively"

hostile work environment.  Where plaintiff never personally witnessed any of the

incidents he cites, he cannot claim that such conduct serves as a foundation on which

to base his hostile work environment claim.  Thus, plaintiff can only demonstrate hostile

work environment if he can demonstrate that the one incident to which he was

subjected altered the terms and conditions of his employment.

The Second Circuit has held that a single incident may create a hostile work

environment if it is "sufficiently severe."  Patterson v. County of Oneida, N.Y., 375 F.3d

206, 225-27 (2d Cir. 2004).  Here, a reasonable jury could determine that the single

incident of sexual misconduct that occurred on November 7, 2013 was sufficiently

---

[7]  "NYSHRL hostile work environment claims are analyzed under the same standard as Title VII
hostile work environment claims."  Russo v. New York Presbyterian Hosp., 972 F. Supp.2d 429 (E.D.N.Y.
2013) (citing Summa v. Hofstra Univ., 708 F.3d 115, 123-34 (2d Cir. 2013)).

severe to create a hostile work environment.  See, e.g., Dillon v. Ned Mgmt., Inc., 85 F. Supp. 3d 639, 663 (E.D.N.Y. 2015) (finding that where the plaintiff's boss made unwanted contact with her buttock, "that single incident of contact is sufficient to constitute the creation of a hostile work environment"); Bermudez v. City of New York, 783 F. Supp. 2d 560, 594 (S.D.N.Y. 2011) (holding a reasonable jury could conclude that an incident involving two male employees opening the female plaintiff's legs and suggesting that a female employee engage in oral sexual conduct was sufficiently severe as to create a hostile work environment);

However, the analysis does not end there.  A plaintiff *also* must demonstrate that the conduct altered the terms and conditions of his employment.  See Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000) (citation and internal quotation marks omitted) ("To withstand summary judgment, a plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.").  This is an analysis that requires assessment of the totality of the circumstances.  Id. (citation omitted).  For a single, severe incident of harassment to create a hostile work environment, the"single incident must create an 'intolerable alteration' of the plaintiff's 'working conditions, so as to substantially interfere with or impair his ability to do his job.'"  Davis-Bell v. Columbia Univ., 851 F. Supp.2d 650, 672 (S.D.N.Y. 2012) (quoting Ferris v. Delta Air Lines, Inc., 277 F.3d 128, 136 (2d Cir. 2001)).

Plaintiff does not dispute that he resigned from CDTA prior to the incident due to

his finding different employment.  Further, plaintiff admits that he worked the remainder

of his shift, three and one-half hours, following the incident.  He did not indicate that he

was unable to complete his work for the remainder of his shift, and the record

demonstrated that he took his meal break with coworkers, went on a call to repair a bus

that had broken down, and said goodbyes to at least one coworker at the end of his

shift.  He did not report the incident to CDTA that day, or at any time.  He did not tell

anyone at CDTA that he was upset by the incident.  In his response to CDTA's

statement of material facts, plaintiff admits that he "did not know if he was upset about

the incident at that time," but that he felt "violated and humiliated, and certainly felt

upset after he had a chance to reflect on the incident."  Dkt. No. 90 at 14.  Mancini

testified that he observed that plaintiff appeared "fine, normal joking like he always did"

for the remainder of his shift, and that plaintiff did not express to Mancini that he was

upset when they ate their meals together that evening or when plaintiff said goodbye to

him at the end of his shift.  Dkt. No. 79-8 at 53.  A week following the incident, plaintiff's

ex-stepfather, Dennis Dugan, a former CDTA employee, contacted Kelli Schreivogl, the

Director of Human Resources, and told her that plaintiff was doing "fine," and that

Dugan did not think the incident "was a big deal."  Dkt. No. 89-38 at 65.  Dugan also

testified at his deposition that "after" the incident, plaintiff was "more distant" and did not

have a steady girlfriend like he usually did, but also testified that he did not discuss the

incident with plaintiff.  Id. at 67.  Richard Chevalier testified that after the incident

plaintiff "was pretty upset" and "[h]e being very quiet, I guess.  He wasn't himself."  Dkt.

No. 89-36 at 72.  Chevalier further testified that at unspecified times after the incident,

when he saw plaintiff, he "was kind of quiet" and that "[i]t is not like he used to be." Id. at 95. Even assuming that plaintiff was upset or quiet following the incident or for three and one-half hours remaining in his final shift, this does not demonstrate that the incident altered the conditions of his employment for purposes of establishing a hostile work environment claim.

As plaintiff has not demonstrated that the single incident of sexual misconduct that occurred on November 7, 2013, with three and one-half hours left in his last day of employment, so altered the conditions of his employment such that it rendered plaintiff's work environment "intolerable" in order to demonstrate a hostile work environment claim. David-Bell, 851 F. Supp at 672. Although plaintiff may have suffered distress or embarrassment during or following the incident, leading him to seek therapy,[8] there is no evidence that the remainder of his employment was so altered to amount to a hostile work environment. Indeed, plaintiff testified that his "symptoms" did not begin until "about a week after the incident." Dkt. No. 90 at 24. Because the singular incident of Baez's conduct, and the alleged instances of sexual harassment or sexual conduct at CDTA did not alter the terms or conditions of plaintiff's employment, it is not necessary to consider whether others' conduct must be imputed to CDTA as the employer. However, for purposes of a thorough analysis, the Court finds, as discussed below, that plaintiff also has failed to demonstrate that the conduct of those allegedly involved in the incident on November 7, 2013 should be imputed to CDTA.

---

[8] Plaintiff's opposition papers include an "evaluation" record dated March 5, 2014, four months after the incident, from "Center for Family Practice." Dkt. No. 89-9.

## 2.  Imputing Conduct to Employer

Even if plaintiff had demonstrated the existence of a hostile work environment, plaintiff has not demonstrated that the individual employees' alleged misconduct should be imputed to CDTA.  For a plaintiff to "impute" employees' conduct onto the employer, in the case of a supervisor engaging in harassing behavior, the conduct may be imputed to the employer where (1) the supervisor takes tangible employment action against the plaintiff, or (2) the employer is unable to establish the affirmative defense that it (a) exercised reasonable care, and that (b) the plaintiff unreasonably failed to take advantage of preventative opportunities.  See Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998).  An employee is considered a "supervisor" where the employee has the ability "to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Vance v. Ball State Univ., 570 U.S. 421, 429 (2013) (internal quotation marks and citation omitted).

Where the harassing conduct is committed by a non-supervisory coworker, "the employer will be held liable only for its own negligence."  Duch v. Jakubek, 588 F.3d 757, 762 (2d Cir. 2009).  "An employer's negligence can be established by showing that it failed to provide a reasonable avenue for a plaintiff's complaint or that "it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action"  Id.  In the context of summary judgment, "[i]f the evidence creates an issue of fact as to whether an employer's action is effectively

remedial and prompt, summary judgment is inappropriate."  Smith v. Town of

Hempstead Dep't of Sanitation Sanitary Dist. No. 2, 798 F. Supp. 2d 443, 454 (E.D.N.Y.

2011) (quoting Gallagher v. Delaney, 139 F.3d 338, 348 (2d Cir.1998), abrogated on

other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998)).  "Liability for an

employee's discriminatory acts may not be imputed to an employer, under state law,

'unless the employer became a party to it by encouraging, condoning, or approving it.'"

Brown v. City of New York, No. 11 CIV. 2915, 2013 WL 3789091, at *18 (S.D.N.Y. July

19, 2013) (quoting Forrest v. Jewish Guild for the Blind, 3 N.Y.3d 305, 311 (2d Cir.

2006)).

     Insofar as plaintiff seeks to impute to CDTA Baez, Clanton, and Mancini's

conduct for the incident that occurred on November 7, 2013 under first avenue for

imputing conduct to the employer – supervisory involvement in the misconduct –

plaintiff admits that, despite Clanton and Mancini's positions as foreman, he "has no

evidence that these Defendants had sufficient supervisory authority to directly impute

liability to CDTA (i.e. power to hire, fire, and/or discipline)[.]"  Dkt. No. 91 at 29 n.7.

Although it is the case that "[a]n employer is subject to vicarious liability to a victimized

employee for an actionable hostile environment created by a supervisor with immediate

. . . authority over the employee," Mack v. Otis Elevator Co., 326 F.3d 116, 123 (2d Cir.

2003)), the record shows that Clanton, Mancini,[9] and Baez did not have *immediate*

supervisory authority over plaintiff as that term is defined by NYSHRL.  Although

---

     [9]  Although Mancini was a supervisor at the time, plaintiff admits that he was not plaintiff's
supervisor.  Dkt. No. 90 at 2.

Clanton and Baez, as foreman, may have had some role in supervising plaintiff, as plaintiff concedes, Dkt. No. 90 at 2, they did not have the power to hire, fire, or recommend or take discipline; thus, for purposes of this NYSHRL analysis, they are not considered to be supervisors.  See Vance, 570 U.S. at 429.  Therefore, plaintiff cannot succeed under the theory that the defendants involved were supervisors.  See Faragher, 524 U.S. at 807.

Thus, plaintiff can only impute employees' conduct onto CDTA by demonstrating that the employer failed to provide a reasonable avenue for complaint or "knew (or reasonably or should have known) about the harassment but failed to take appropriate remedial measures."  Johnson v. Xerox, 838 F. Supp.2d 99, 105 (W.D.N.Y. 2011) ("Where an employee is the victim of sexual harassment, including harassment in the form of a hostile work environment, by non-supervisory co-workers, an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial measures.").  If an employer has notice of the harassment, i.e., that it knew or should have known about the harassment, the "law imposes upon the employer a duty to take reasonable steps to eliminate it."  Dabney v. Christmas Tree Shops, 958 F. Supp. 2d 439, 460.  "An employer's calculated inaction in response to discriminatory conduct may, as readily as affirmative conduct, indicate condonation.'"  Flanagan v. GEICO General Ins. Co., 11-CV-2682 (JS)(GRB), 2015 WL 7273210, at *5 (E.D.N.Y. Mar. 31, 2015) (quoting Clark v. City of N.Y., No. 13-CV-0210, 2014 WL 4804237, at *4 (E.D.N.Y. Sept. 25, 2015) (additional citation omitted)).

Plaintiff does not argue that CDTA failed to provide a reasonable avenue for complaint.[10]  Plaintiff admitted that he received the employee handbook, and underwent yearly training regarding discrimination and harassment in the workplace.  Dkt. No. 90 at 4.  However, he testified that he never reported the incident, or any incident of inappropriate sexual conduct, to CDTA.  Id. at 16.  Further, although the existence of a sexual harassment policy does not, alone, demonstrate that there is a reasonable avenue for complaint, the record supports such conclusion.  As soon as CDTA became aware of the incident, those alleged to have been involved were suspended and an investigation commenced.  Id. at 17-18; Dkt. No. 79-11 at 12-15; Dkt. No. 79-12 at 55-60.  Plaintiff does not dispute that once CDTA was informed of the incident, the parties alleged to have been involved were suspended and that the incident was investigated.  CDTA has demonstrated that it had in place a sexual harassment policy, that all employees were required to attend yearly sexual harassment training, and that complaints that were reported to CDTA were properly addressed.  Indeed, plaintiff does not dispute the fact that all of the complaints that plaintiff referenced that were reported to CDTA – including the complaints regarding Baez and Shagalski in 2009 – were addressed and investigated.  See, e.g., Dkt. Nos. 89-10, 89-11, 89-12, 89-13, 89-14.  Thus, it is clear that plaintiff had a reasonable avenue for complaint.  Accordingly, the Court must address whether plaintiff has demonstrated actual or constructive

---

[10]  Plaintiff, on page 30 of his brief, cites case law (from outside of the Second Circuit) addressing reasonable avenue for complaint.  Dkt. No. 91 at 30 (citing Frederick v. Spring/United Mgmt. Co., 246 F.3d 1305, 1314 (11th Cir. 2001); Farley v. Am. Cast Iron Pipe Co., 115 F.3d 1548, 1554 (11th Cir. 1997)).  However, plaintiff provides argument and no analysis for this Court to assess regarding whether CDTA failed to provide a reasonable avenue for complaint.  Instead, plaintiff reiterates his argument that sexually inappropriate conduct permeated the workplace.  Id. at 31.

knowledge of the harassment.

"Where the employer has provided a reasonable avenue for complaint, the plaintiff must 'show that (1) someone had actual or constructive knowledge of the harassment, (2) the knowledge of this individual can be imputed to the employer, and (3) the employer's response, in light of that knowledge, was unreasonable." Johnson, 838 F.Supp. 2d at 105 (quoting Duch, 588 F.3d at 763).  Plaintiff suggests that CDTA had actual or constructive knowledge of the hostile work environment insofar as he argues that "[t]he widespread nature of this conduct by employees and low-level supervisors creates the inference that his conduct was known and tolerated by CDTA." Dkt. No. 91 at 32.  Further, plaintiff contends that the conduct engaged in by upper level supervisory employees and superintendents "demonstrate that there was an unwritten policy of pervasive sexual misconduct in the workplace that was tolerated by CDTA." Id. (citing Exh. 31, Baez's DHR Complaint).[11]  In arguing that CDTA knew or should have know of the allegedly pervasive sexual misconduct in the workplace, plaintiff suggests that "the fact that the supervisors were repeatedly engaging in such conduct with impunity is further evidence of a widespread custom that was tolerated by CDTA." Id.[12]  Thus, plaintiff appears to argue that because employees, low-level supervisors,

---

[11]  In citing this exhibit for support of his argument, plaintiff is referring to a complaint that Baez filed with the Division of Human Rights after he was terminated from CDTA.  Thus, this claim is based on Baez's statement within that complaint that "on several occasions" Wacksman "made discrininating [sic] remarks to myself and other Puerto Rican employees by making sexual remarks in Spanish, thinking it was funny . . . .  He has made it exceptable [sic] behavior in our department[.]" Dkt. No. 89-31 at 19.

[12]  It is not clear from plaintiff's brief whether plaintiff is attempting to argue that upper-level supervisors and/or superintendents' participation in alleged acts of sexual misconduct should result in application of direct liability under the Faragher test.  To the extent this argument is presented, it must fail. Although upper-level supervisors' alleged participation in sexual conduct may be relevant to the question of pervasiveness, such an argument must fail insofar as he may be contending that the Court should apply

and high-level supervisors regularly engaged in sexually-inappropriate conduct in the workplace, their conduct must be imputed to CDTA because their involvement suggests CDTA's condonation of this conduct.  Plaintiff also contends that CDTA was aware of the sexual conduct in the workplace because some formal complaints were filed.  Id.

To the extent that plaintiff may imply that Baez's past discipline involving the access or attempted access of pornography on a work computer in 2009 amounted to notice of Baez's propensity to engage in sexual misconduct, and thus, likelihood to engage in the November 7, 2013 incident, such argument would fail, as, once reported, CDTA investigated and disciplined Baez in connection with the 2009 incident, and there is no evidence in the record that Baez engaged in this conduct again or that any party reported that he engaged in such conduct.

Plaintiff cites Distasio v. Perkin Elmer Corp., contending that "'an employer is considered to have notice of sexual harassment if the employer – or any of its agents or supervisory employees – knew or should have known of the conduct.'".  Dkt. No. 91 at 30 (citing Distasio, 157 F.3d 55 (2d Cir. 1998)).  However, in Distasio, the Court made clear that this standard applies when an official has actual or constructive knowledge, and defines an official as someone "at a sufficiently high level in the company's management hierarchy to qualify as a proxy for the company," where "the official is charged with a duty to act on the knowledge and stop the harassment," or where "the official is charged with a duty to inform the company of the harassment."  Id. at 64

_____

the test relevant for participation of supervisors because plaintiff has failed to show that any higher-level supervisory defendants took part in the specific conduct alleged to have occurred to plaintiff.

(quoting Torres v. Pisano, 116 F.3d 625, 636-37 (2d Cir. 1997).  Here, the employees involved in the specific incident at hand were not at a sufficiently high level in the company, and plaintiff has not demonstrated that supervisory officials were aware of the remainder of the alleged misconduct.[13]

Insofar as plaintiff suggests that supervisor and superintendents' participation in sexual misconduct in the workplace serves as a basis on which to impute the November 7, 2013 misconduct to CDTA because the high-level employees' participation in sexual misconduct in the workplace amounts to tacit acceptance of such misconduct, the Court rejects this argument for the same reason it was rejected in the hostile work environment analysis, supra.  Plaintiff seeks for this Court to apply a standard that is broader than that applied by Courts in this Circuit – essentially he asks this Court to conclude that supervisory-level employees' participation in unrelated acts of inappropriate sexual misconduct in the workplace suffices to impute sexual misconduct of any employee to the employer because the supervisors' misconduct demonstrates that there was a pervasive environment of sexual misconduct in the workplace. However, Courts have not applied such a standard.

Plaintiff's citation and discussion of the 11th Circuit case, Griffin v. City of Opa-Locka, 261 F.3d 1295, 1308 (11th Cir. 2001) and the Second Circuit case Petrosino v.

_____

[13]  As a threshold issue, plaintiff, citing to Brown v. City of New York, contends that CDTA should be "'deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory [sic] responsibility.'" Dkt. No. 91 at 29 (citing Brown v. City of New York, No. 11 Civ. 2915 (PAE), 2013 WL 3789091, at *18 S.D.N.Y. July 19, 2013).  However, plaintiff omits the fact that Brown cites New York City Administrative Code 8-108(13)(b)(2) for this proposition.  Brown indicates that this is a "stricter" standard of liability for employers in the New York City Administrative Code than what is provided under the NYSHRL.  See Brown, 2013 WL 3789091, at *18.  This case does not involve application of the New York City Administrative Code, and plaintiff provides no legal authority that this standard applies in NYSHRL cases.

Bell Atlantic, 385 F.3d 210, 222 (2d Cir. 2004) do not require a different finding.  In support of his argument that "widespread conduct" "creates the inference" that CDTA was aware of the misconduct and condoned it, plaintiff contends that the work environment in the case at bar is comparable those in Griffin and a Fourth Circuit case discussed in Petrosino where the Court held that employee misconduct could be imputed to the employer.  Dkt. No. 91 at 31.  In Griffin, the Eleventh Circuit declined to overturn a jury verdict against the defendant city where "several witnesses" testified about the individual defendant – a city manager – discussing his sex life "in front of various department heads and other City employees"; the City attorney, plaintiff, and "numerous other female employees" testified that the defendant manager asked them on dates, "[a]sked them to cook for him, told them that they owed him something, and questioned them about their sex lives"; "a group of female city employees," on "at least two occasions," complained to the City attorney that the defendant manager was making inappropriate sexual comments to them, touching them, asking for sexual factors, punishing those who refused, giving raises to those who did not deserve them, and showing favoritism; the City attorney received complaints from a City clerk about the defendant manager asking her on dates, questioning her "about who her lover was," and was "giving her a hard time because she was not reciprocating his advances; the City Attorney testified that the defendant manager asked her "to go to a nude bar with him and her that he would like to see her drunk" and that when the City Attorney reported to the mayor complaints she received from other employees about the defendant manager's conduct, the mayor did not take remedial action; an administrative

assistant testified that the defendant manager asked her about her sex life and "indicated to her that he wanted her to dress more provocatively"; the acting director of human resources testified that the defendant manager stood so close to her she could feel his breath on her neck, told her he liked woman of her physique, kissed her without provocation, and summoned her to his office to ask her for an "intimate kiss"; three employees testified that the defendant manager threatened their job or salary when they declined his advances; an interviewee testified that the defendant manager made sexual comments to her, gave her a city credit card and told her to rent them a room, and that when she declined, she was not given the job. 261 F.3d at 1309-11. Further, a high ranking official, the city commissioner, testified that the defendant employer knew of the defendant manager's problems with sexual harassment and misconduct. Id. It is clear that the alleged conduct regarding the pervasiveness of the workplace is not comparable to Griffin, where several employees made complaints to supervisory officials about sexual misconduct and such complaints were ignored.

Further, the Court agrees with CDTA that Petrosino does not hold, as plaintiff argues, that "such widespread conduct created the inference that the employer was aware of it and condoned it." Dkt. No. 95-1 at 10 (citing Dkt. No. 91 at 31). Instead, in Petrosino, the question before the Second Circuit was "whether Petrosino's work environment could objectively be deemed hostile to women." 385 F3d at 221. The Court was reviewing whether the offensive conduct could be deemed discriminatory based on sex and was not reviewing whether the conduct was sufficiently severe under a hostile work environment analysis.

Similarly, the remainder of the cases plaintiff cites, apparently as support of pervasive hostile work environments, involve allegations by the plaintiff that "she was subjected to repeated sexual harassment that was reported and ignored by the municipality or governmental agency."  Dkt. No. 95-1 at 10; Dkt. No. 90 at 31 (citing Wise v. New York City Police Dep't, 928 F. Supp. 355, 365 (S.D.N.Y. 1996)[14]; Valentin v. New York City, 94 CV 3911 (CLP), 1997 WL 33323099, at *6 (E.D.N.Y. Sept. 9, 1997)[15]; Bohen v. City of East Chicago, Indiana, 799 F.2d 1180, 1187-89 (7th Cir. 1986)[16]).

As plaintiff has failed to state a claim against CDTA for Monell liability under section 1983 and failed to state a claim for hostile work environment pursuant to NYSHRL, defendant CDTA's Motion for Summary Judgment is granted in its entirety.

---

[14] "Wise also presents detailed and explicit allegations that she was harassed, propositioned, physically touched, and spoken to in a sexual manner by police officers on numerous occasions over the course of the five years before the training room incident; that she was subjected to training films containing pornography; that pornographic materials were routinely posted at the station house; and that she complained constantly about the sexual harassment without effect. She also alleges that other women in the Precinct were subjected to sexual harassment. In addition, Wise has submitted the affidavit of Colleen Meenan, who stated that there were pornographic materials all around precinct houses and that supervising officers never took action to remove any of this material.  Wise has raised issues of fact concerning whether there was a custom or practice of sexual harassment at the Police Department sufficient to impose liability under Monell. "  Wise v. New York City Police Dep't, 928 F. Supp. 355, 365 (S.D.N.Y. 1996).

[15] "Apart from Valentin's own testimony regarding the regular use by Sergeant Gaines of sexually explicit verbal comments about women and about his exploits with women, Valentin has presented evidence showing that other rank and file female officers, as well as command officers, were aware of the conduct." Valentin v. New York City, No. 94 CV 3911 (CLP), 1997 WL 33323099, at *6 (E.D.N.Y. Sept. 9, 1997).

[16] "The court found that Bohen suffered many instances of sexual harassment and often complained of them through official channels, but that nothing was done.  Further, 'the department did not even have a written policy against sexual harassment until after Bohen had been fired.' Id. It is clear that supervisory department officials knew of the sexually oppressive working conditions even before Bohen was hired since they warned her of them during an office interview.  The department, however, considered the abusive environment to be the female employees' problem."
Bohen v. City of E. Chicago, Ind., 799 F.2d 1180, 1187 (7th Cir. 1986) (internal citation omitted).

## II. Clanton and Mancini's Motion for Summary Judgment

Defendants Clanton and Mancini move for summary judgment in a separate

motion from CDTA.  Defendant Mancini argues that plaintiff's Equal Protection claim,

brought pursuant to section 1983, must be dismissed because (1) Mancini did not act

under color of state law, (2) Mancini did not "intend" to harm plaintiff, (3) Mancini's

actions were not "based on sex," and (4) Mancini's actions were not sufficiently severe

to alter the terms and conditions of plaintiff's employment.  Dkt. No. 78-18.  Further,

Mancini argues that he is entitled to qualified immunity.  Id.  Defendant Clanton argues

that plaintiff's claim pursuant to the NYSHRL must be dismissed because Clanton's

actions were not  (1) intentional discrimination on the basis of sex, or (2) sufficiently

severe or pervasive to rise to the level of a hostile work environment.  See generally

Dkt. No. 79-18.

Plaintiff contends that Mancini[17] violated the Equal Protection Clause of the

Fourteenth Amendment, pursuant to section 1983, for (1) failing to intervene to protect

plaintiff from Baez and Clanton,[18] and for his own conduct of photographing or recording

the incident and sharing that video with fellow CDTA employees.[19] Dkt. No. 91 at 17.[20]

---

[17]  This Court dismissed plaintiff's equal protection claim (1st Cause of Action) as alleged against
Clanton.  Dkt. No. 51 at 43; Dkt. No. 22 at 7.

[18]   Plaintiff argues, in conjunction with his Cross Motion to Amend, that defendant Mancini is
liable under the NYSHRL for aiding and abetting Clanton's conduct.  Plaintiff did not plead a NYSHRL
claim against Mancini in his amended complaint.  Dkt. No. 22; Dkt. No. 91 at 17 n.4. The undersigned will
address this argument in its review plaintiff's Motion to Amend.

[19]  Pursuant to plaintiff's first cause of action, plaintiff argued that Mancini also failed to
"implement" or "enforce" "adequate policies and procedures" relating to supervision or discipline, and
failing to "institute an appropriate training regimen" relating to "sexual harassment and inappropriate
sexual conduct in the workplace."  Dkt. No. 91 at 17; Dkt. No. 22 at 7.  However, plaintiff has made no
such argument in opposition to defendants Mancini and Clanton's Motion for Summary Judgment.  Thus,

Plaintiff argues that Clanton is liable under the NYSHRL for sexually harassing plaintiff,[21] and for aiding and abetting Baez's misconduct.  Id.

### A.  Clanton and Mancini Facts

The facts are detailed herein only to the extent they differ from the facts set forth in the undisputed facts section reviewing CDTA's Motion for Summary Judgment, supra.  On November 7, 2013, Baez and Mancini were supervisors during the second shift.  Dkt. No. 79-18 at 9-10.  Baez was supervising the "floor," which included plaintiff and the mechanics, and Mancini was supervising the "cleaners."  Id. at 10.  Mancini had no supervisory role over plaintiff that day, and Clanton "had no supervisory role over plaintiff at all."  Id.  "On occasion," a "small group of mechanics – a 'circle of friends' – would engage in wrestling, teasing and joking on their last day of service with CDTA."  Id.  This group included Clanton, and nonparties Justin Schmidt, Adam Schmidt, Michael Hermance, Kevaun Thomas, and Darnell Bridye.  Id.  Clanton's intent when approaching plaintiff was to joke around and wrestle with him, give plaintiff a hug and a handshake, and wish plaintiff 'good luck[.]'"  Id.  Clanton heard [p]laintiff "gigging and

_____

this claim is deemed abandoned.

[20]  In plaintiff's Third Cause of Action in the Amended Complaint, plaintiff names Mancini in the heading – along with CDTA, Carm Basile, Steve Waxman, and Lance Zarcone –  indicating that he violated "Constitutional Rights Under Color of State Law – Implementation of Municipal Policies and Practices that Directly Violate Constitutional Rights/ Failure to Implement Municipal Policies and to Avoid Constitutional Deprivations and/or Failure to Train and Supervise Employees under Color of State Law[.]" Dkt. No. 22 at 9.  Plaintiff does not mention Mancini's name within the body of this Cause of Action – instead he collectively refers to "defendants" -- and does not specify the allegations specific to Mancini.  Id.

[21]  As the Court will discuss, infra, in the operative pleading, plaintiff did not claim  that Clanton is liable under the NYSHRL for his own, independent misconduct.  Dkt. No. 22.

laughing as they fell to the floor together." Id.  Clanton did not see Baez approach plaintiff.  Id. at 11.  "Immediately upon noticing Baez, Clanton jumped up and off of the plaintiff."  Id.

From Mancini's position at the foreman's desk, his view of the incident was obstructed.  Dkt. No. 79-18 at 11.  Mancini heard laughing, and walked toward the laughter.  Id.  He arrived "after the incident had already begun."  Id.  Mancini "saw Clanton immediately jump up, followed closely by Baez and the plaintiff."  Id.  Mancini had his phone "up" but "was unable to take a photo of the incident."  Id. at 12.  Mancini did not realize Baez's pants were down until Baez stood.  Id. Shortly after the incident, plaintiff, Clanton, and nonparty Michael Hermance walked outside together as Clanton's shift was ending.  Id.  Clanton told plaintiff, "I can't believe Juan [Baez] went that far." Id.  Plaintiff described Clanton's actions to Chevalier as "wrestling."  Id. at 12.  At the end of his shift, plaintiff hugged Mancini and gave him a flashlight.  Id. at 13.

## B.  Analysis

### 1. Equal Protection - Section 1983

It is well settled that "sex-based discrimination may be actionable under § 1983 as a violation of equal protection."  Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006).  Further, "sex-based discrimination, including sexual harassment, may be actionable under § 1983 as a violation of equal protection."  See Kern v. City of Rochester, 93 F.3d 38, 43 (2d Cir. 1996); Cowan v. City of Mt. Vernon, 95 F. Supp.3d 624, 643 (S.D.N.Y. 2015) (observing that "[s]exual harassment that rises to the level of

gender discrimination is actionable under § 1983 as violative of the Fourteenth

Amendment right to equal protection.").  Courts in this Circuit look to Title VII for

guidance as to the standard to apply to hostile work environment claims brought under

the Equal Protection Clause.  See Hayut v. State Univ. of N.Y., 352 F.3d 733, 744-45

(2d Cir. 2003).

> Consequently, adapting the standards of Title VII to the
> Equal Protection Clause, it has been held that a plaintiff
> makes out an equal protection hostile work environment
> claim by showing: (1) intentional harassment, (2) based on
> sex, (3) under color of state law, that is (4) sufficiently
> extensive to render the work environment hostile to plaintiff.

Dawson, 351 F.Supp. 2d at 194 (citing Lange v. Town of Monroe, 213 F.Supp. 2d 411,

423 (S.D.N.Y. 2002), abrogated on other grounds by Vega v. Hempstead Union Free

Sch. Dist., 801 F.3d 72 (2d Cir. 2015).  Harassment affects a term, condition, or

privilege of employment if it is sufficiently severe or pervasive to alter the terms or

conditions of the victim's employment and create an abusive working environment.  See

Harris v. Forlkift Sys, Inc., 510 U.S. 17, 21 (1993).


### a. Personal Involvement

Claims brought pursuant to § 1983 require a showing that defendant was

personally involved in the alleged constitutional deprivation.  See Wright v. Smith, 21

F.3d 496, 501 (2d Cir. 1994).  Personal involvement includes "'not only the direct

participation in the alleged violation but also gross negligence in the supervision of

subordinates who committed the wrongful acts and failure to take action upon receiving

information that constitutional violations are occurring.'"  Negron v. Ulster County, 1:08-

CV-692 (FJS/RFT), 2012 WL 3597398, at *5 n.4 (N.D.N.Y. Aug. 20, 2012) (quoting Patterson, 375 F.3d at 229)).

Although Mancini does not use the term "personal involvement," he argues that it is "undisputed that he did not actually participate in the incident forming the basis for this suit" as plaintiff's "claims against him focus on plaintiff's assumption that Mancini took a photo of the incident," but  the record demonstrates Mancini took no photos (Dkt. No. 79-18 at 16).[22]  Mancini contends that plaintiff testified that he did not see Mancini arrive at the scene, and did not know how long he was present while the incident occurred.  Dkt. No. 79-18 at 16.  Further, Mancini argues that his and Chevalier's testimony "makes clear that Mancini arrived at the scene after the incident had already begun; and that, based on the laughter he heard prior to arriving at the scene, Mancini reasonably believed that the three men all were simply joking around."  Dkt. No. 79-18 at 17.  In addition, Mancini points out that he testified that "he did not realize that Baez's pants were lowered until Baez stood up and the incident was all over."  Id.  Mancini does not address plaintiff's claim about a video recording, which plaintiff first raises in opposition to the Motions for Summary Judgment.  Dkt. No. 79-18.

Plaintiff adamantly disputes Mancini's recollection of his involvement and of the incident, and contends that there are material issues of fact in dispute.  Dkt. No. 91 at 34-36.  Specifically, plaintiff contends that during an interview with the director of Human Resources, Mancini reported that when he approached the scene of the incident, he saw Baez's pants down, and that Superintendent Premo recounted Mancini

---

[22]  Mancini argues that he had his phone out to take a picture, but did not take a picture because he is "technology challenged . . . and it went that fast." Dkt. No. 89-16 at 1; Dkt. No. 89-41 at 49-50.

reporting similar statements.  Id. at 34.  Further, plaintiff indicates that Mancini's

testimony regarding plaintiff laughing is disputed by his own testimony, as well as the

testimony of CDTA employees Chevalier and Takechand.  Id. at 34.  Plaintiff indicates

that Chevalier testified that he heard yelling, and believes the yelling came from plaintiff.

Id. (citing Dkt. No. 91-36 at 34, 56-57, 63, 68).  Plaintiff also cites Takechand's

testimony stating that plaintiff was screaming at defendants to get off of him.  Dkt. No.

91-44 at 55-56, 64, 71.  Plaintiff notes that Mancini initially testified that he did not hear

"anything" from plaintiff and did not hear him laughing, but also testified that he did not

recall whether he heard plaintiff laughing.  Dkt. No. 91 at 34 (citing Dkt. No. 89-41 at

48).  Further, plaintiff refers to Mancini's interview with CDTA wherein he stated he

could not determine plaintiff's reaction to the incident because plaintiff was facing away

from him.  Id. (citing Dkt. No. 91- 16).  Finally, plaintiff indicates that there is evidence

that Mancini directly participated in the misconduct "by recording the incident and

showing the video to other employees."  Id. at 36.[23]

Plaintiff appears to rest his claim largely upon Mancini's duty to intervene to stop

the incident due to his supervisory position as foreman.  Dkt. No. 91 at 20, 33, 34, 36-

37.  However, Mancini disputes this characterization, noting that although he was a

foreman, he was assigned to supervise the "cleaners," and had he had no supervisory

role over plaintiff or Clanton, who were mechanics.  Dkt. No. 89-41 at 20.  Rather,

---

[23]  In plaintiff's Amended Complaint, plaintiff indicated only that Mancini took a picture or pictures
of the incident.  Dkt. No. 22 at 7.  Plaintiff does not allege in the Amended Complaint that Mancini showed
these photographs to others.  See id.  In opposition to defendants' Motion for Summary Judgment, plaintiff
argues that Mancini recorded a video and showed it to others employees.  See Dkt. No. 91 at 8, 18, 20,
36.

Mancini indicates that Baez was plaintiff's supervisor that evening.  Id.  Lacking from the record is any evidence that Mancini's role as foreman for the cleaners would include intervening to stop misconduct of another foreman or employee he was not supervising, or to protect a mechanic he was not responsible for supervising.  However, even assuming Mancini had a duty to intervene due to his supervisory position as a foreman, on this record it cannot be determined the degree of knowledge Mancini had about what was occurring.

As a threshold issue, the Court finds that plaintiff has failed to demonstrate a question of fact as to whether Mancini showed a video of the incident to other employees.  In support of plaintiff's argument that Mancini recorded the incident and showed it to other employees, plaintiff cites Takechand's testimony.  Dkt. No. 91 at 8 (citing Dkt. No. 44 at 118-20).  Takechand testified that he saw Mancini "recording the whole incident" and then saw "a couple of guys standing by the service desk," including Clanton, Mancini, and Baez.  Id.  Takechand further testified that he assumed the video they were watching was Mancini's recording of the incident, but that he did not actually see the video.  Dkt. No. 44 at 119.  Thus, the only testimony plaintiff relies on to support his argument that Mancini showed a video he recorded to other employees is Takechand's.  Dkt. No. 91 at 8.  However, Takechand testified merely that he "believed" that Mancini showed a video of the incident to other employees, but that he "assumed" the video was of the incident as he not see the actual video.  Dkt. No. 44 at 118-20.  As plaintiff's only witness to testify that Mancini showed a video of the incident to other employees cannot confirm with personal knowledge that the video Mancini allegedly

was showing to employees was of the incident, plaintiff has not demonstrated a material question of fact as to whether Mancini showed a video of the incident to others.

Although there is no material question of fact regarding whether Mancini showed a video he recorded of the incident to other employees, it is disputed is whether Mancini recorded and/or took a picture[24] of the incident.  Mancini testified that he attempted or intended to take a photograph, but did not actually take photograph.  Dkt. No. 89-41 at 49-50.  Plaintiff, by contrast, contends that Mancini recorded a video of the incident. Dkt. No. 91 at 8, 18, 20, 33, 36-37.  Accordingly, the Court concludes that there exists material questions of fact as to Mancini's personal involvement with regard to his knowledge of what was occurring, and whether he took a photograph or video of the incident.  Therefore, the Court declines to grant summary judgment on the basis of lack of personal involvement.[25]

### b.  Color of State Law

Mancini contends that plaintiff cannot demonstrate that he acted under color of state law because any involvement Mancini may have had in the incident did not involve the use of his state authority or position.  Dkt. No. 79-18 at 18.  Arguing that Judge Suddaby, at the Motion to Dismiss stage, "determined that Defendant Mancini acted

---

[24]  Plaintiff does not appear to allege that Mancini took a picture of the incident *and showed it to others*, only that Mancini (1) took a picture (Dkt. No. 22 at 7), and (2) recorded a video and showed it to others.  Dkt. No. 91 at 8; Dkt. No. 90 at 12, 21.

[25]  Although the Court denies summary judgment to Mancini on personal involvement grounds, because the Court finds, supra, that plaintiff has failed to demonstrate that Mancini created a hostile work environment in violation of the Equal Protection Clause, it is granting summary judgment as to Mancini on other grounds.

under color of state law when Defendant Mancini failed to supervise his subordinate, Defendant Clanton, when Clanton participated in sexually assaulting Plaintiff," plaintiff contends that this Court has already determined that Clanton acted under the color of state law. Dkt. No. 91 at 36 (citing Dkt. No. 51 at 23). Further, plaintiff contends that "there is ample evidence in the record which establishes that Mancini had a duty to intervene on Plaintiff's behalf, but failed to do so." Id.

Even where plaintiffs "bring their federal claims under § 1983, courts look to Title VII cases for guidance in § 1983 Equal Protection Clause actions." Burhans v. Lopez, 24 F. Supp. 3d 375, 381 (S.D.N.Y. 2014) (quoting Feingold, 366 F.3d at 139). "[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." West v. Atkins, 487 U.S. 42, 50 (1988). "In a § 1983 suit, 'a defendant necessarily acts under color of state law when he abuses the position given to him by the State. Thus, 'a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." Wagner v. Burnham, et al., No. 1:03-CV-1522, 2006 WL 266551, at *5 (N.D.N.Y. Feb. 1, 2006). A plaintiff must demonstrate that the actor exercised "power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." Rose v. Zullioux, 84 F. App'x 107, 109 (2d Cir. 2003) (summary order) (quoting West, 487 U.S. at 39). "However, not all acts performed by public employees are under color of state law: 'acts of officers in the ambit of their personal pursuits are plainly excluded.'" Gleason v. Scoppetta, 566 F. App'x 65, 68 (2d Cir. 2014) (summary order) (quoting

Screws v. United States, 325 U.S. 91, 109 (1945)).  "'[T]here is no bright line test for distinguishing personal pursuits from activities taken under color of law."  Id. (quoting Pitchell v. Callan, 13 F.3d 545, 548 (2d Cir. 1994)).  Further, an employee can be held to be acting "under color of law for purposes of Section 1983 liability where the employee exercises actual authority over a complaining co-employee, even where the employee is not in a formal supervisory relationship with the complaining co-employee." Beattie v. Guilderland Cent. Sch. Dist., 124 F. Supp. 2d 802, 806 (N.D.N.Y. 2000) (internal quotation marks and citation omitted).

Mancini contends that although he was a foreman, he was not responsible for supervising plaintiff on the night in question.  Dkt. No. 79-18 at 19.  Instead, Mancini was responsible for supervising cleaners, and Baez was responsible for supervising "the floor," including mechanics plaintiff and Clanton.  Dkt. No. 89-41 at 20-21.  Mancini further argues that plaintiff has not established "that, as a foreman, Mancini had any authority to 'implement' and/or 'enforce' any policies and procedures of CDTA; nor has plaintiff demonstrated that it was part of Mancini's responsibilities to do so for CDTA." Dkt. No. 79-18 at 19.  Plaintiff testified that Baez was his supervisor on the night of the incident.  Dkt. No. 89-40 at 32.

Plaintiff points out that Judge Suddaby held, on the Motion to Dismiss, that "[t]hese facts plausibly suggest that Defendant Mancini directly participated in the incident because he was a supervisor who personally observed the assault but failed to intervene in it" but that ". . . it is unclear whether Mancini's role as a foreman, and thus a

supervisor required him to intervene."[26]  Although Judge Suddaby merely held that

based on the facts presented at the Motion to Dismiss stage, if proven, *could*

demonstrate that Mancini had a duty to intervene, and his failure to do so amounted to

an action taken under color of state law.  See Dkt. No. 51.  However, the disputed

questions of fact identified by Judge Suddaby are still present before the Court.  If it is

the case that Mancini  (1) had supervisory authority and was aware of the fact that Baez

had his pants down or that Clanton was "dry humping" plaintiff, or (2) took a picture or

video of the incident when he was aware that plaintiff was being assaulted, he *may* be

held to have acted under the color of state law.  See Wise, 928 F. Supp at 368 (holding

that under section 1983, "[a] supervisory officer may be held liable for failing to

intervene to stop the discriminatory conduct of other officers if the supervisor 'had

actual or constructive knowledge of gender-discriminatory policies and that he permitted

such conduct to continue, or was grossly negligent in his management of subordinates

who promoted such conduct.'") (quoting Carrillo v. Ward, 770 F. Supp. 815, 822

(S.D.N.Y. 1991), citing Meriwether v. Coughlin, 879 F.2d 1037, 1047-48 (2d Cir. 1989)).

Thus, determination of whether Mancini acted under color of state law is dependent on

---

[26]  Plaintiff cites a variety of cases discussing a police officer's duty to intervene as support for his argument that Mancini had a duty to intervene to protect him from Baez and Clanton.  Dkt. No. 91 at 33 (citing Wellington v. Langendorf, 9:12-CV-1019 (FJS/DEP),  2013 WL 3753978, at *10 (N.D.N.Y. July 13, 2013); Velazquez v. City of Hialeah, 484 F.3d 1340 (11th Cir. 2007); Dutton v. Reynolds, No. 3:12-cv-427-J-39-JRK, 2014 WL 4540161, at *4 (M.D. Fla. Sept. 11, 2014); Sandra T.E. v. Sperlik, 639 F.Supp. 2d 912, 919 (N.D. Ill. 2009) (collecting cases holding police officer's failure to intervene in excessive force could render officer liable for excessive force)).  However, these cases involve a discussion of well-settled Second Circuit precedent reiterating a law enforcement officer's duty to intervene to protect the constitutional rights of citizens from being violated by other law enforcement officers.  Wellington, 2013 WL 3753978, at *10; Velazquez, 484 F.3d at 1343; Dutton, 2014 WL 4540161, at *2; Sandra, 639 F. Supp. 2d at 919 (discussing cases involving police officers' duty to intervene to prevent fellow officers from violating constitutional rights of others via excessive force). These cases are not relevant to the question before the Court.

(1) whether Mancini had supervisory authority over plaintiff, (2) failed to remedy a wrong after learning about it, or (3) was grossly negligent in managing subordinates.[27] Id. at 368.

Here, Mancini did not have direct supervisory authority over Clanton or plaintiff, who were mechanics, as Mancini was supervising the "cleaners" on November 7, 2013. Baez was supervising the mechanics on the evening in question. Further, it does not appear to be in dispute that Mancini did not have supervisory authority over Baez, as they were both foremen, and were equally positioned. It is further undisputed that Mancini, as foreman, did not have the authority to recommend or implement discipline. Dkt. No. 90 at 3. Although Mancini did not have authority to discipline or implement discipline, it is unclear whether he – in a supervisory role as a foreman – had a duty to intervene when he observed misconduct of which he was aware, even if those involved were not directly under his supervision. Further, there are material questions of fact in dispute regarding how much of the incident Mancini observed and whether he was aware that Baez's pants were down or whether plaintiff was not "joking around."

Plaintiff also argues that Mancini can be held liable for his direct participation, insofar as he allegedly filmed the incident. Dkt. No. 91 at 8-9, 18, 20, 33, 37 ("Defendant Mancini is responsible for failing to intervene to protect the Plaintiff, and for participating in the incident by videotaping it, and showing it to other employees."). Insofar as plaintiff argues that Mancini's conduct in recording the video – as a separate

_____

[27] Plaintiff argues that Mancini is liable for his (1) direct participation, and (2) failure to intervene. He does not argue that Mancini created a "policy or custom under which unconstitutional practices occurred" nor does he appear to argue that Mancini was "gross[ly] negligent in managing subordinates." Wise, 928 F. Supp. at 368 (quoting Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996)).

act of misconduct from his alleged his duty to intervene – was an act under color of state law, the Court disagrees.  To the extent Mancini's alleged role of filming or attempting to film the assault can be considered "participation" in the incident, plaintiff has wholly failed to demonstrate how the act of filming was "made possible only because he was clothed with the authority of state law or that he was misusing some power that he possessed by virtue of state law." Dkt. No. 51 at 24.  Accordingly, as plaintiff has failed to show that Mancini's sole alleged act of recording the incident was an act taken under the color of state law, summary judgment is granted on this claim.  However, to the extent this argument is merely a restatement of plaintiff's contention that Mancini had a duty to intervene and did not – thus, filming the incident rather than attempting to stop Baez and Clanton's conduct, as distinct from the isolated act of filming the incident –  due to the question of fact regarding Mancini's supervisory role, the Court concludes, as stated above, that there is a question of fact as to whether Mancini's actions of failing to intervene when he had a duty to do so were taken under the color of state law.

### c. Intentional Harassment & Based on Sex

Mancini argues that plaintiff cannot demonstrate that his alleged misconduct of recording or photographing the incident and failing to intervene was "intentional" as required to demonstrate a hostile work environment pursuant to section 1983.  Dkt. No. 79-18 at 20-21.  Mancini also argues that he cannot be held liable because his alleged

conduct was not "based on sex."  Dkt. No. 79-18 at 21.[28]  Plaintiff does not directly address the "intentional" argument, but contends that the Court should "presume" that the defendants "were motivated by sex" because "the incident involved physical contact with gender-specific body parts."  Dkt. No. 91 at 27.

"The 'intent' prong requires proof that the defendant's discriminatory conduct was intentional; the conduct was based on the plaintiff's status as a male or female, rather than some other personal characteristic."  Hollis v. City of Buffalo, 28 F.Supp. 2d 813, 825 (W.D.N.Y. 1998) (quoting Trautvetter v. Quick, 916 F.2d 1140 (7th Cir. 1990)).  This Court has previously urged "caution" in sexual harassment cases "'where questions of state of mind are enmeshed in complicated fact scenarios rife with disagreement.'"  Strasser v. Irving Tissue, Inc., 1:09-CV-747 (LEK/RFT), 2011 WL 1882279, at *6 (N.D.N.Y. May 17, 2011) (citing Distasio v. Perkin Elmer Corp., 157 F.3d 55, 61 (2d Cir.1998)).

Mancini contends that as he has been accused of only "witnessing" and "taking a photo" of the incident, plaintiff cannot demonstrate that he intended to harass plaintiff because of his gender.  Dkt. No. 79-18 at 22.  Although plaintiff challenges Mancini's knowledge of the exact conduct that was occurring, he does not challenge defendant Mancini's assertion that he did not know that Baez was going to act as he did, which was confirmed by Baez's testimony stating that he did not inform anyone that he was

---

[28]  Mancini's motion separates the analyses for "intentional" and "based on sex."  Dkt. No. 78-18 at 20.  However, although Mancini properly sets forth the standard, it is the Court's understanding that the "intentional" inquiry is to be analyzed within the "based on sex" analysis.  See Hollis v. City of Buffalo, 28 F.Supp. 2d 813, 825 (W.D.N.Y. 1998) (quoting Trautvetter v. Quick, 916 F.2d 1140 (7th Cir. 1990)).  Thus, the Court will assess these prongs together.

going to "tea bag" plaintiff.  Dkt. No. 79-18 at 21-22.  Further, Mancini argues that plaintiff does not argue that his conduct, specifically, was intended as gender-based harassment.  Id.  Further, Mancini contends that although plaintiff's allegations in his amended complaint regarding defendants' alleged past sexual misconduct in the workplace may have sufficed to defeat the Motion to Dismiss on a claim that all of the defendants' alleged misconduct was "based on gender," discovery has revealed that plaintiff's allegations of similar misconduct by Baez and Clanton have not been proven, and that further, even those unproven allegations in the amended complaint of past sexual misconduct in the workplace did not involve claims against Mancini.  Id.  The Court agrees.

Referring to all defendants' collectively, plaintiff argues that defendants' conduct was motivated by plaintiff's gender.  Dkt. No. 91 at 17.  Specifically, plaintiff contends the act of "tea bagging" is a "gender-specific act" that is usually performed on males, defendants Clanton and Baez "primarily directed" their "sexually inappropriate" conduct toward their male co-workers, and Clanton and Baez "applied a gender stereotype against male employees by assuming it was acceptable to teabag men, as opposed to women."  Id. at 23-26.

In arguing that Mancini's conduct was motivated by gender, plaintiff refers solely to Baez and Clantons' alleged motivations.  See Dkt. No. 91 at 17, 23-26.  He provides no motivation as to Mancini's alleged conduct.  Id.  Even assuming for the sake of this argument that Clanton and Baez's conduct was motivated by plaintiff's gender, plaintiff fails to explain how Mancini's alleged conduct – recording the incident and failing to

53

intervene to prevent the misconduct – was motivated by gender.  First, plaintiff's references to Clanton and Baez's alleged acts of "Dry humping" and "tea bagging" as acts generally performed on males does not serve to support an argument that *Mancini*'s alleged acts were motivated by gender.  Similarly, plaintiff alleges that "defendants" "primarily targeted male employees" with acts of sexual misconduct.  Dkt. No. 91 at 25.  More specifically, plaintiff contends that, collectively, "Defendants routinely dry humped, tea bagged, slapped their male co-workers' buttocks, and showed pornography to their male coworkers."  Dkt. No. 91 at 25.  However, review of the Amended Complaint and plaintiff's opposition papers demonstrate that none of this conduct was alleged to have been committed by Mancini.[29]  Next, plaintiff argues that Clanton and Baez "applied a gender stereotype against male employees" insofar as they "assumed" it was acceptable to tea bag a male employee rather than a female.  Dkt. No. 91 at 26.  Again, plaintiff has made no allegation that Mancini applied a gender stereotype, as he makes no argument – nor could he – that Mancini was involved in the act of "tea bagging" plaintiff.  Id.  Finally, plaintiff asks the Court to "presume" that defendants' conduct was motivated by gender due to contact with "gender specific body parts."  Id. at 27.  As there is no allegation that Mancini had any bodily contact with plaintiff, this argument cannot support a conclusion that Mancini's conduct was

---

[29]  Specifically, plaintiff alleged that (1) Baez and Clanton "assaulted another CDTA employee, whereby they tackled him and pretended to rape him, by 'dry humping him," (2) Defendant Baez and Clanton had 'Tea Bagged' other CDTA employees" and one such act "was witnessed by a high ranking supervisor at the CDTA"; (3) a CDTA employee complained that Baez showed the employee pornography, and investigation did not show that Baez showed an employee pornography, but did reveal that Baez attempted to access pornographic websites from a work computer; (4) Wacksman slapped employees' buttocks; and (5) certain nonparty supervisory employees showed other employees a sexually-inappropriate video involving Christmas elves.  See Dkt. No. 22 at 5; Dkt. No. 91.

motivated by gender.

Accordingly, plaintiff has failed to demonstrate that Mancini intended to discriminate against plaintiff on the basis of his sex through his alleged conduct of recording the incident and failing to intervene as is required to demonstrate a intentional, sex-based hostile work environment claim under section 1983. Therefore, defendant Mancini's Motion to Dismiss plaintiff's Equal Protection claim is granted.

### d. Severity of Conduct

As the Court has determined that plaintiff has not shown that Mancini's conduct was intentional or motivated by plaintiff's gender, it need not determine whether Mancini's alleged conduct was severe enough to render his workplace hostile. However, were the Court to reach that determination, it would conclude that it was not.

"The matter of whether the conduct alleged was so 'severe or pervasive" as to create "'an objectively hostile or abusive work environment,' . . . is to be decided based on the totality of the circumstances, in light of such factors as the "'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Patterson, 375 F.3d at 227 (internal citation omitted). "This is not, and by its nature cannot be, a mathematically precise test." Harris, 510 U.S. at 22. The question whether a work environment is hostile or abusive is based on the standard of a reasonable person – whether that person subjectively perceived his or her work environment as hostile, and whether the conduct actually created a work environment

that a reasonable person would find to be hostile or abusive.  See Forrest, 3 N.Y.3d at 311.  "A work environment is 'objectively hostile' where a reasonable person who is the target of discrimination would find the working conditions so severe or pervasive as to alter the terms and conditions of employment for the worse."  Yerry v. Pizzahut of Southeast Kansas, 186 F. Supp. 2d 178, 184 (N.D.N.Y. 2002) (citing Richardson v. New York State Dept. of Corr. Serv., 180 F.3d 426, 436 (2d Cir. 1999)).  Factors relevant to determining whether a plaintiff's working conditions meet the standard may include: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with [the] plaintiff's work; and (5) what psychological harm, if any, resulted."  Id. (citing Harris, 510 U.S. at 23).

Although difficult to separate each defendants' alleged involvement, it is undisputed that as to Mancini, plaintiff argues only that he recorded or took photos of the incident, and failed to intervene.  Plaintiff suggests that he suffered from "humiliation and degradation given that the assault occurred while numerous employees and at least one supervisor laughed and videotaped him."  Dkt. No. 91 at 20.  Further, plaintiff argues, generally, that as a result of the incident, he has "suffered from embarrassment, humiliation, and anxiety."  Dkt. No. 91 at 22.  Accepting as true for purposes of this argument plaintiff's claims that he was upset, humiliated, and embarrassed during the incident and was "upset" or "down" immediately after the incident, he does not specify that this embarrassment or depression arose due to Mancini's alleged participation of taking a photograph or video or failing to intervene, or that it was Mancini's conduct that

sufficiently altered the terms or conditions of his employment.[30]  Although plaintiff contends that he was "humiliated" and "degraded" at least in part because "one supervisor laughed and videotaped him," he does not demonstrate that such embarrassment altered the terms and conditions of his employment.  Dkt. No. 91 at 20.  Instead, he contends that the incident itself – arguably Baez and Clanton's conduct – lead to the alleged embarrassment and depression resulting in psychological treatment. As this Court has previously discussed, the incident occurred on the last day of plaintiff's employment with CDTA, plaintiff completed the remainder of his shift, did not complain to any employee or supervisor that he was upset about the incident, socialized with the defendants at different points through the rest of his shift, and never reported the incident to CDTA.  Further, plaintiff concedes that he was unsure how he felt immediately following the incident, and it was not until he reflected that he felt these feelings.  Dkt. No. 90 at 14.  Thus, any argument that Mancini's conduct sufficiently altered the terms or conditions of his employment is without merit.

Thus, although the Court has concluded that plaintiff has failed to demonstrate a Fourteenth Amendment violation due to plaintiff's failure to demonstrate that Mancini's conduct was based on sex, plaintiff has also failed to demonstrate that Mancini's conduct was sufficiently severe to alter the terms or conditions of his employment with CDTA.

--------

[30]  To the extent an inference may be made that plaintiff is arguing that he suffered emotionally because Mancini shared a photo or video with other employers, the Court notes this contention would be denied as plaintiff has failed to demonstrate a question of fact as to whether Mancini showed a photo video of the incident to others. See supra at 45.  In fact, the record suggests that Takechand shared photos of the incident with fellow employees.  Dkt. No. 89-44 at 66-67, 74-75.

### e. Qualified Immunity

As the undersigned finds that plaintiff has failed to demonstrate that Mancini's alleged misconduct was intentional and motivated by gender, and thus, failed to prove that Mancini violated the Fourteenth Amendment's Equal Protection Clause, the Court need not determine whether Mancini would be entitled to qualified immunity.

### 2. NYSHRL Hostile Work Environment

Plaintiff argues that Clanton is liable under the NYSHRL for aiding and abetting Baez's misconduct by restraining plaintiff while Baez "teabagged" him. Dkt. No. 91 at 19-20.[31] Dkt. No. 97 at 25. Clanton argues that "[i]t is clear that, if no reasonable juror could find CDTA primarily liable for Baez's alleged harassment of plaintiff under 296(1), then Clanton cannot, as a matter of law, be held liable for his alleged participation in the harassment. Id. at 97 at 31. Further, Clanton argues that "no reasonable juror could find that Clanton 'share[d] the intent or purpose' of Baez in engaging in plaintiff's

---

[31] Plaintiff further argues that Clanton is liable under the NYSHRL for his own conduct of tackling and "dry humping" plaintiff. First, Clanton points out that plaintiff did not properly plead a NYSHRL claim against Clanton because although Clanton was named in the header of the Fourth Cause of Action of the Amended Complaint, plaintiff solely mentions Baez and CDTA. Dkt. No. 79-18 at 26. Second, Clanton argues that plaintiff has not properly set forth a claim that Clanton is liable under the NYSHRL for his own conduct, rather than just aiding and abetting Baez's conduct. More specifically, Clanton contends that plaintiff's proposed Second Amended Complaint and opposition papers "add allegations that defendant Clanton engaged in sexual harassment of plaintiff by 'tack[ling] [plaintiff] and dry-hump[ing] him on the floor of the CDTA garage" in violation of the NYSHRL. Dkt. No. 97 at 10. The Court agrees that an argument that Clanton violated the NYSHRL for his own conduct is not properly before this Court as such a claim is not set forth in the Amended Complaint. See Dkt. No. 22. Notably, plaintiff's Motion to file a Second Amended Complaint does not seek to amend in order to add this claim against Clanton; instead, it solely seeks to add a claim for aiding or abetting against Mancini. See Dkt. No. 91 at 37-38. The Court will address in this section the only argument properly before the Court – that Clanton aided and abetted Baez's misconduct in violation of the NYSHRL. The Court will then address whether plaintiff can bring his claim that Clanton's "dry humping" violated the NYSHRL in its discussion of plaintiff's cross motion to file a Second Amended Complaint.

harassment, and therefore shared a 'community of purpose' with Baez." Id.

As this Court has determined that CDTA cannot be held liable under NYSHRL, it must follow that Clanton cannot be held liable for aiding or abetting Baez's misconduct under section 296(6). As highlighted by defendants, this Court has previously set forth that "'[i]t is the employer's participation in the discriminatory practice which serves as the predicate for the imposition of liability on others for aiding and abetting,' Murphy v. ERA United Realty, 15 A.D.2d 469, 472 (2d Dep't 1998) [;thus], a plaintiff 'cannot prevail against [an individual] on her state . . . claims unless she can first establish the liability of [her employer].'" Pellegrini, 740 F. Supp.2d at 356 (quoting DeWitt v. Lieberman, 48 F. Supp.2d 280, 293 (S.D.N.Y. 1999)); see also Gallo v. Alitalia-Linee Aeree Italinae-Societa per Azioni, 585 F. Supp.2d 520, 546 (S.D.N.Y. 2008) ("Before accessorial liability can be found as to an alleged aider and abettor, the plaintiff must first establish liability as to the employer/principal."); Duviella v. Counseling Serv. of Eastern Dist. of N.Y., No. 00-CV-2424 (ILG), 2001 WL 1776158, at *18 (E.D.N.Y. Nov. 20, 2001) (same). As plaintiff argues that Clanton aided and abetted Baez's misconduct, and no argument could be made that Baez was the "employer" as defined by the NYSHRL, because this Court has dismissed all claims against CDTA, plaintiff cannot proceed with an aiding and abetting claim against Clanton. See Pellegrini 740 F. Supp.2d at 356. Accordingly, summary judgment is granted in favor of defendant Clanton on this ground.

### III.  Plaintiff's Motion for Leave to File a Second Amended Complaint

Plaintiff cross-moves for leave to file a Second Amended Complaint, arguing that he seeks solely to add a claim against defendant Mancini for aiding and abetting Baez's misconduct pursuant to the NYSHRL.  Dkt. No. 91 at 37-38.  Defendants Mancini and Clanton oppose plaintiff's motion.  Dkt. No. 79-18, 97.  Clanton argues that plaintiff improperly proceeds in his opposition brief as if he has already pleaded a claim against Clanton under the NYSHRL for his own misconduct, but no such claim exists in the operative pleading nor has plaintiff moved to amend in order to add this claim.  Id. at 9-11.  Mancini argues that plaintiff's motion to add a claim that he aided or abetted Baez and Mancini's misconduct must be denied because (1) a claim against Mancini for aider and abettor liability is futile if the Court dismisses the NYSHRL claim against CDTA; and (2) the amendment is untimely and prejudicial, and plaintiff cannot provide good reasons for the delay.  Id. at 14-21.

### A.  Clanton

The Court agrees with defendant Clanton.  Although plaintiff seeks leave to amend his complaint to add a claim of aiding and abetting liability against defendant Mancini, he proceeds in his opposition papers as if his current pleading contains a claim against Clanton for his own misconduct under the NYSHRL.  See Dkt. No. 91 at 19-20.  However, a review of the amended complaint and the record reveals that no such claim exists, and plaintiff's Motion to Amend does not seek to add this claim.  See Dkt. No. 22; Dkt. No. 91 at 37-38.  Although the title of the Fourth Cause of Action of the Amended

Complaint states that it is alleged against CDTA, Baez, and Clanton, the Cause of Action itself sets forth no claims against Clanton. Dkt. No. 22. The only portion of the cause of action that even arguably mentions someone other than Baez or CDTA is his contention that "Defendant Baez's conduct violated Plaintiff's rights under the Human Rights Law, in that *the Defendants* sexually harassed Plaintiff *when Baez placed his testicles* on the top of Plaintiff's head." Id. at 11. Even with an extremely liberal reading, this is not sufficient to plead claim that Clanton aided or abetted Baez's misconduct. However, even if the Court were to interpret the Fourth Cause of Action as stating a claim for against Clanton, any such claim is exclusively in relation to aiding and abetting Baez's misconduct. Id. No interpretation of the operative pleading can suggest that plaintiff pleaded a claim that Clanton's *own* actions, apart from Baez, were an independent violation of the NYSHRL. Id. The operative pleading does not even allege that Clanton dry humped plaintiff; rather, it contends that Clanton "h[e]ld plaintiff aggressively," "chased after" plaintiff, "picked [plaintiff] up in the air and dropped him dace down on the ground," "grabbed Mr. Hoit's arms and forced them behind his back," and "is seen holding Mr. Hoit on the ground." Id. at 3, 5.

Further, as Clanton correctly highlights, "in response to defendants' pre-answer motions to dismiss, [plaintiff] specifically withdrew any claim that Clanton subjected him to a hostile work environment in violation of Section 296(1), thereby asserting only that Clanton aided-or-abetted his own conduct in violation of Section 296(6)." Dkt. No. 97 at 10-11 (comparing Dkt. No. 1 at ¶¶45-49 with Dkt. No. 22 at ¶¶46-50). Thus, a NYSHRL claim against Clanton for his individual misconduct of "dry humping" plaintiff is not

properly before the Court.  Thus, plaintiff's attempt to proceed against Clanton for

violating the NYSHRL for his individual misconduct of May 22, 2018 "dry humping"

plaintiff is denied.


### B.  Mancini

Insofar as plaintiff seeks to amend the operative pleading to add a claim against

Mancini for aiding and abetting Baez and Clanton's misconduct under the NYSHRL,

such request is denied for the reasons set forth in defendants' reply brief.  Dkt. No. 97;

Dkt. No. 89-51 at ¶ 49.  To that analysis, the Court adds the following comments.

Plaintiff argues that his initial complaint "failed to include a claim against Defendant

Mancini in his cause of action detailing a violation of the New York State Human Rights

Law"; however, plaintiff contends that "[a]fter addressing this motion and researching

the issue, it is clear that such a claim is appropriate, as Mancini clearly aided and

abetted the sexual assault of the Plaintiff by failing to intervene and otherwise

condoning this offensive behavior."  Dkt. No. 91 at 37.  Plaintiff continues that Mancini's

conduct of videotaping the incident and then sharing that videotape[32] with CDTA

employees further aided and abetted plaintiff's sexual assault.  Id.

First, plaintiff's request to add a claim against defendant Mancini for aiding and

abetting Baez and Clanton's alleged misconduct must fail.  As this Court has already

---

[32]  The Court has already concluded that plaintiff has failed to demonstrate a genuine issue of
material fact as to whether Mancini shared a video of the incident with other CDTA employees.  See supra
at 45.  Thus, in addition to the reasons set forth herein denying plaintiff's request to add an aiding and
abetting claim against Mancini, insofar as plaintiff seeks to amend in order to argue that Mancini shared a
video with other employees, such request must also be denied due to plaintiff's failure to demonstrate a
material question of fact as to that allegation. See Dkt. No. 91 at 37, Dkt. No. 89-51 at ¶49.

noted, because plaintiff has failed to establish CDTA's liability, it cannot set forth an aiding and abetting claim against the individual defendants.  Supra at 57-58 (citing Pellegrini, 740 F. Supp.2d at 356.  Thus, a claim against Mancini for aiding and/or abetting Mancini and is futile. See, e.g., Turczyn v. Shanley, 6:13-CV-1357(GLS/ATB), 2015 WL 12748635, at *2 (N.D.N.Y. Dec. 14, 2015) ("[A] proposed amendment is futile if it is clearly frivolous, meritless, or fails to raise at least colorable grounds for relief.") (citation omitted).  "[I]t is well established that leave to amend a [pleading] need not be granted when amendment would be futile." Savitsky v. Mazzella, 210 F. App'x 71, 72 (2d Cir. 2006) (summary order) (quoting Ellis v. Chao, 336 F.3d 114, 127 (2d Cir. 2003)).

However, even if plaintiff's claim were not futile, this Court would deny plaintiff's Motion to Amend as plaintiff has failed to show good cause for his undue delay in seeking to file a second amended complaint.  Plaintiff merely contends that "researching" while drafting his opposition memorandum lead him to believe that a claim would be "appropriate."  Dkt. No. 91 at 37.  However, plaintiff fails to explain why he would have been unaware of this claim at an earlier time, nor does he contend that he proceeded with proper diligence.  Since the earliest stages of this litigation, plaintiff alleged that Mancini failed to intervene and took a photograph of the alleged incident. Thus, it is clear that plaintiff was in possession of the information necessary to assert an NYSHRL claim for Mancini's individual misconduct prior to the expiration of deadlines for motions to amend and certainly before the filing of dispositive motions.  See, e.g., Grochowski v. Pheonix Const., 318 F.3d 80, 86 (2d Cir. 2003) (citing Parker v.

Columbia Pictures Indust., 204 F.3d 326, 340-41 (2d Cir. 2000).  Indeed, the allegation

of dry humping came from plaintiff himself, and plaintiff fails to explain why his amended

complaint does not make this factual allegation.  Dkt. No. 89-40 at 79-80.

Further, although plaintiff contends that defendants would not suffer prejudice were the

Court to permit this amendment, the Court finds otherwise.  Plaintiff seeks to add a

claim against Mancini for his own alleged misconduct of dry humping plaintiff.  This

conduct was not alleged in the second amended complaint, and defendants were

unable to look into such claim as discovery has long been closed, and dispositive

motions had already been filed at the time plaintiff filed his motion to amend.  Dkt. No.

22.  Further, the Court disagrees with plaintiff's implied argument that because the

proposed claim is "closely related to the Plaintiff's other civil rights claims against

Mancini as a supervisor," Mancini will suffer no prejudice should this amendment be

permitted.  Dkt. No. 91 at 37.  Were the Court to grant the motion to amend, it would

require the Court to reopen discovery and would require the Court to delay the trial

currently set for June 25, 2018.  See, e.g., Monahan v. New York City Dep't of Corrs.,

214 F.3d 275, 284 (2d Cir. 2000) (quoting Block v. First Blood Assocs., 988 F.2d 344,

350 (2d Cir. 1993)).  Even if the Court had not determined this matter to be futile, the

Court is unwilling, at this late stage of this action, to grant this belated Motion to Amend.

Accordingly, for the reasons stated above, plaintiff's Motion to file a Second Amended

Complaint is denied.  Dkt. No. 91.

## IV. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby

**ORDERED**, that defendant CDTA's Motion for Summary Judgment (Dkt. No. 81) is **GRANTED**, and it is further

**ORDERED**, that the defendants Tony Clanton and Frank Mancini's Motion for Summary Judgment, (Dkt. No. 79), is **GRANTED**; and it is further

**ORDERED**, that plaintiff's Cross-Motion to file a Second Amended Complaint (Dkt. No. 91) is **DENIED**; and it is further

**ORDERED**, that within **ten (10) days** of entry this Memorandum-Decision and Order, plaintiff must file a status update with the Court with regard to plaintiff's pending claims against defendant Juan Baez, who has not yet appeared in this action.

**IT IS SO ORDERED**.

Dated: May 22, 2018
        Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

65